■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALICIA LEWIE, Appellant. [889 NYS2d 265]—

Kavanagh, J. Appeals (1) from a judgment of the County Court of Warren County (Hall, Jr., J.), rendered June 26, 2008, upon a verdict convicting defendant of the crimes of manslaughter in the second degree (two counts), reckless endangerment in the first degree and endangering the welfare of a child, and (2) from a judgment of said court, rendered June 27, 2008, which resentenced defendant.

On the evening of November 13, 2007, a 911 call was received at the Warren County Sheriff's Department from a woman later identified as defendant to the effect that she was en route to the hospital because she had fallen in the shower while holding her infant child and, as a result, the child was severely injured. Upon defendant's arrival at Glens Falls Hospital, emergency

room medical staff found that the child was not breathing and had no heartbeat. An initial examination revealed that the child—who was less than eight months old—had extensive bruising at different stages of healing around his eyes and head, red marks on his neck and torso and bite marks on both arms. Radiological studies determined that the child's right arm was broken, his lung was collapsed, his liver was lacerated, numerous ribs were fractured and that multiple bleedings had occurred in and around the brain. After extensive efforts were made to resuscitate the child, his heartbeat was restored, but because he could not breathe on his own, he was placed on a respirator. The child was later transferred to Albany Medical Center and, after no brain activity was detected, life support was removed. Shortly thereafter, at 6:18 P.M. on November 14, 2007, the child expired.

Because of the injuries noted on the child upon his initial admission into the hospital and inconsistencies in the statements made by defendant and her roommate/boyfriend, Michael Flint, Jr., as to the cause of these injuries, emergency room personnel notified the Glens Falls Police Department, which immediately commenced an investigation. Defendant repeated the claim to the police that she had made to emergency room personnel that the child had been injured when she fell while holding him in the shower. Over the next 48 hours, defendant made a series of statements to the police, two of which were reduced to writing, in which she acknowledged that she had lied when she had said that the child was with her in the shower when injured; instead, defendant told police that on November 12, 2007 she had gone to work and left the child with Flint, who, during a telephone call later that day, told her that the child had been injured when he slipped out of Flint's hands in the shower and struck his head and neck on the faucet and shower bar. According to defendant, when she told her coworkers what had happened with the child, they advised her to examine the child closely for any evidence of head trauma and consider taking him to a doctor for appropriate medical attention. Upon her return home that evening, defendant saw that the child's eyes were black and blue, his lip was swollen and there were red marks on his neck and torso. However, defendant claimed that the child did not appear to have a concussion and, when he otherwise appeared normal, she decided not to seek medical attention. Instead, she put the child to bed and gave him Tylenol, Orajel and a bottle of formula. Throughout the night, defendant checked on the child's condition and, on the following morning, noted that while some of the bruises on his face looked to be healing, the injuries to his eyes, neck and torso had blackened and appeared to have grown worse.

The next day, defendant, with the child and Flint, briefly left their apartment and stopped at the local Community Action Program.[1] There, when an employee asked about the bruises that she had noticed on the child's eyes and face, defendant stated that they had occurred as a result of a fall in the shower and that a doctor who examined the child said he was in fine condition. Later that day, defendant went to work and once again left the child in Flint's care. That evening, when Flint arrived with the child to pick defendant up from work, he told her that he could not wake the child. Defendant took the child out of the car and when she found that he was limp and having difficulty breathing, she called 911 and drove to the hospital. After the child had been transferred to Albany Medical Center, the Department of Social Services filed an emergency application in Family Court to remove the child from defendant's care and, in connection with that proceeding, at approximately 3:25 P.M. on November 14, 2007, defendant was assigned legal counsel. It was later that same day that the child was removed from life support and succumbed to his injuries.

The post-mortem examination established that the child had sustained numerous blunt force injuries to his head and face, abrasions across his neck and bite marks on both arms.[2] X rays revealed that the child had numerous fractures to his ribs, some of which had occurred as long ago as four weeks prior to his death and were in various stages of healing. In addition, it was confirmed that the child's liver had been lacerated and that there had been a substantial accumulation of blood in and around his brain. The cause of death was established as cerebral edema and subdural hemorrhage with a subarachnoie hemorrhage due to closed head injuries.

After the child's death, defendant was brought to police headquarters where, for a second time, she was read her *Miranda* warnings and, once again, agreed to provide the police with a written statement regarding the circumstances surrounding her son's death. In this statement, defendant repeated much of what she had previously told the police regarding what had transpired in the days leading up to her son's death but, for the first time, claimed that when she had arrived home on the evening of November 12, 2007 and saw the child's injuries, she attempted to bring him to a local hospital, but Flint prevented her. She stated that she believed Flint would hurt her if she

---

1. Flint was on probation for a conviction relating to animal cruelty and was participating in an alternate sentencing program.

2. The fracture was apparently the result of a bite inflicted on the child's arm.

pressed the issue and did not seek medical treatment for the child at that time because she was afraid of how Flint would react if he were ultimately found to be responsible.[3] Shortly after providing this statement, defendant was arrested and subsequently charged by indictment with two counts of manslaughter in the second degree (counts six and seven), reckless endangerment in the first degree (count eight) and endangering the welfare of a child (count nine).[4] After a jury trial, defendant was convicted of each count and sentenced to an aggregate prison term of 7 1/3 to 22 years.[5] Defendant now appeals.

Preliminarily, defendant argues that once she was assigned counsel in the Family Court removal proceeding, any statement she subsequently made to the police should have been suppressed as having been taken in violation of her constitutional right to counsel. We disagree. While the criminal investigation and the Family Court removal proceeding "arise out of the same matrix, they are unrelated in that the [Family Court] proceeding was a civil proceeding focusing on the children, whereas the purpose of this action was to secure a criminal conviction against defendant" (*People v Kent*, 240 AD2d 772, 773 [1997], *lvs denied* 90 NY2d 1012 [1997], 91 NY2d 875 [1997]; *see People v Roselle*, 84 NY2d 350, 355 [1994]; *People v Smith*, 62 NY2d 306, 314-315 [1984]; *People v Snyder*, 221 AD2d 870, 871 [1995], *lv denied* 88 NY2d 885 [1996]). Since the Family Court proceeding was civil in nature, the assignment of counsel in that proceeding did not automatically trigger defendant's right to counsel in the criminal investigation that was being conducted to determine the cause of her son's death.

As for the statements that were admitted into evidence at trial, we note that defendant was not in custody when, prior to her son's death, she was first interviewed by the police at the hospital or later that same evening when she agreed to ac-

---

**3.** At trial, defendant disavowed this statement claiming that she had thought the child was fine, saw no reason to seek medical treatment and denied that Flint had physically abused her or her child.

**4.** In the same indictment, Flint was charged with murder in the second degree (two counts), manslaughter in the first degree (two counts) and endangering the welfare of a child. He ultimately pleaded guilty to two counts of murder in the second degree and manslaughter in the first degree and was sentenced to a prison term of 22 years to life. Flint's judgment of conviction was affirmed on appeal (*People v Flint*, 66 AD3d 1245 [2009]).

**5.** Specifically, defendant received two concurrent terms of 5 to 15 years for the two manslaughter convictions; 2 1/3 to 7 years for her reckless endangerment conviction, to run consecutively to the term of imprisonment imposed for her manslaughter convictions; and one year for her endangering the welfare of a child conviction.

company them to the police department to give a statement (*see People v Pouliot*, 64 AD3d 1043, 1046 [2009]; *People v Baggett*, 57 AD3d 1093, 1095 [2008]; *People v Ward*, 42 AD3d 579, 580 [2007], *lv denied* 9 NY3d 883 [2007]). As for her two written statements, each was taken only after defendant was properly advised of her *Miranda* rights, agreed to waive her constitutional rights, and volunteered to talk to police as to the circumstances surrounding her son's hospitalization and subsequent death (*see People v Ward*, 42 AD3d at 580; *People v Maddox*, 31 AD3d 970, 973 [2006], *lv denied* 7 NY3d 868 [2006]). Therefore, we conclude that County Court correctly denied her motion to suppress and properly admitted these statements into evidence at trial.

Defendant also contends that her convictions for manslaughter in the second degree and reckless endangerment in the first degree were not based upon legally sufficient evidence and were against the weight of the evidence introduced at trial. As for her claim of legal sufficiency, we note that a criminal conviction will be sustained as being supported by legally sufficient evidence "when the proof, viewed in the light most favorable to the prosecution, establishes the elements of the crime beyond a reasonable doubt" (*People v Baker*, 4 AD3d 606, 609 [2004], *lv denied* 2 NY3d 795 [2004]; *see People v Barreto*, 64 AD3d 1046, 1048 [2009]). Here, defendant stands convicted of two counts of manslaughter in the second degree, the first alleging conduct that occurred between November 11, 2007 and November 14, 2007, while the second focused on a continuing course of conduct that occurred from October 1, 2007 until the date of the child's death. Count six, as amplified by the bill of particulars, alleges that defendant, despite being aware that the child had been seriously injured while in Flint's care on November 12, chose not to seek medical care for the child and, as a result, he died. Defendant contends that the evidence at trial introduced on this charge failed to establish that she was aware of the true extent of her son's injuries when she first learned of his fall in the shower and, as a result, could not have known the mortal risk those injuries posed to his health and well-being prior to taking him to a nearby hospital. She also argues that even if it were proven that she was truly aware of the seriousness of those injuries on the night of November 12, it was not established at trial that these injuries actually caused his death.

While it is undisputed that defendant, after being told by Flint of the incident in the shower, observed that the child had bruises and abrasions on his head, face and body, it was not established at trial that, based upon these observations, she

knew that the child had sustained life-threatening injuries that would ultimately cause death. In fact, upon the child's admission to the hospital, his internal injuries—the cranial bleeding, the lacerated liver and fractured ribs—were only detected after multiple X rays were performed and blood tests were conducted by hospital personnel. In addition, the medical examiner testified that the internal injuries that caused the child's death were only detected upon his internal inspection of the child's remains during the postmortem examination. Equally important, while the medical examiner ultimately concluded that death was the result of trauma to the child's head, he was unable, based on his examination, to precisely pinpoint the period in time when the trauma resulting from these injuries was inflicted upon the child and could only offer an opinion that these injuries occurred at any time "within four days [prior to his death]." As a result, the evidence at trial failed to establish, as this count in the indictment required, that defendant was aware that her son had been gravely injured as a result of the fall in the shower (*see* Penal Law § 15.05 [3]; § 125.15 [1]; *People v Wong*, 81 NY2d 600, 608 [1993]; *People v Northrup*, 83 AD2d 737, 738 [1981]), or that the injuries that he incurred as a result of that fall ultimately caused his death (*see People v Stewart*, 40 NY2d 692, 697 [1976]; *People v Raymond*, 56 AD3d 1306, 1307-1308 [2008], *lv denied* 12 NY3d 820 [2009]; *People v Phippen*, 232 AD2d 790, 791 [1996]; *see also People v Wong*, 81 NY2d at 608). For these reasons, defendant's conviction for manslaughter in the second degree as alleged in count six must be reversed and the count dismissed.[6]

We do not reach the same conclusion as to defendant's conviction on the remaining charge of manslaughter or her conviction for reckless endangerment in the first degree. As previously noted, this charge of manslaughter focused on a course of conduct that occurred over a 45-day period immediately prior to the child's death. As amplified by the bill of particulars, it alleges that during this period, defendant actually became aware that Flint was physically abusing her son and chose to ignore the grave risk this conduct posed for the child by repeatedly leaving him in Flint's unsupervised care. In that regard, witnesses, including members of defendant's own family, her friends and coworkers, all testified that defendant told them

---

**6.** Given our decision on this count of the indictment, we do not address defendant's contention that the two counts of manslaughter contained in the indictment were multiplicitous, a claim that, in any event, was not preserved for our review (*see People v Thompson*, 34 AD3d 931, 932 [2006], *lv denied* 7 NY3d 929 [2006]).

that Flint, on numerous occasions, had physically abused her and was physically abusing her child in her absence. In one instance, defendant is said to have told a coworker that Flint shook the child and bit him when he cried and that "she never knew what she was going to go home to" when she left the child alone with Flint. In addition, defendant told police that she had previously told Flint that he should treat the child as if he were "glass" and that he should "shake [a] yellow teddy bear instead of [the baby]." Finally, medical evidence introduced at trial conclusively established that defendant's son was a battered child and that he had been repeatedly assaulted during the period of time that defendant would leave him in Flint's care. This charge of manslaughter was not based upon one discreet act but, rather, upon a course of conduct that occurred in the weeks immediately prior to the child's death. Therefore, we are of the view that the evidence introduced at trial, when viewed in a light most favorable to the People (*see People v Contes*, 60 NY2d 620, 621 [1983]), established each element required to convict defendant of reckless manslaughter under count seven of the indictment (*see Matter of Anthony M.*, 63 NY2d 270, 280 [1984]; *see also People v Phippen*, 232 AD2d at 790-791; *People v Salley*, 153 AD2d 704, 705 [1989], *lv denied* 75 NY2d 817 [1990]).

As for defendant's conviction for reckless endangerment in the first degree, it must be shown by legally sufficient evidence that defendant recklessly engaged in conduct that created a grave risk of death to her son, and did so under "circumstances evincing a depraved indifference to human life" (Penal Law § 120.25). Again, reference is made to the testimony of defendant's friends and coworkers to the effect that she knew that Flint was physically abusing her son. Those admissions, coupled with defendant's own observations of the child's condition throughout this period and the extensive list of injuries uncovered at the autopsy, established that her decision to leave the child unattended in Flint's care was, at the very minimum, reckless, and clearly placed the child in mortal peril. Her failure to take appropriate steps to address this situation and her refusal to obtain medical care for the child, when it was painfully apparent that he had been injured, demonstrates a depraved indifference on defendant's part to the threat these injuries—and Flint's conduct—posed to her son's survival (*see People v Roe*, 74 NY2d 20, 24 [1989]; *People v Parrotte*, 267 AD2d 884, 886 [1999], *lv denied* 95 NY2d 801 [2000]). Inasmuch as "there is a 'valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury,'" we are of the view that defendant's conviction for

reckless endangerment in the first degree was supported by legally sufficient evidence (*People v Maddox*, 31 AD3d at 971, quoting *People v Bleakley*, 69 NY2d 490, 495 [1987]; *see People v Wisdom*, 23 AD3d 759, 760-761 [2005], *lv denied* 6 NY3d 840 [2006]).

Finally, despite defendant's contention to the contrary, we find that the convictions of manslaughter in the second degree under count seven and reckless endangerment in the first degree were supported by the weight of the evidence. We note from the evidence presented what is painfully obvious and not the subject of meaningful dispute—this eight-month-old child had been severely battered and physically abused over much of his life and that these assaults were perpetrated upon him during a period of time when defendant was charged with his custody and ongoing care. Defendant's statements, coupled with her own observations of the injuries that the child sustained during this period, demonstrate that she was well aware of what Flint was doing to her child and knew the risk Flint posed to him. Despite this knowledge, defendant chose not only to ignore that risk, but to continue to expose the child to this peril by leaving him alone in Flint's care. While defendant puts much of this testimony in issue—and at trial denied ever being abused by Flint or seeing him abuse her child—it is for the jury in the final analysis to assess the credibility of the witnesses who testified (*see People v Barreto*, 64 AD3d at 1048). Having reviewed and weighed the evidence in the record, it cannot be said that the jury's verdict was against the weight of the evidence (*see People v Romero*, 7 NY3d 633, 643-645 [2006]; *People v Bleakley*, 69 NY2d at 495).

Defendant also challenges County Court's failure to grant her motion for a mistrial based on juror misconduct. During jury deliberations, one of the jurors passed a note to County Court asking if she could read a statement in which she thanked all involved, including defendant, for allowing her to serve as a juror, asked the court for the name of a divorce lawyer and requested the name and phone number of the Assistant District Attorney whom she described as a "cutie." The court immediately reprimanded the juror for the content of the statement, characterized her actions as inappropriate and conducted an inquiry as to her ability to remain fair and impartial. After the court met with the juror and concluded that the juror had not engaged in conduct that rendered her unqualified to serve, defense counsel moved for a mistrial, al-

leging that the note evinced the juror's clear bias in favor of the prosecution.[7]

According to CPL 270.35 (1), "[i]f at any time after the trial jury has been sworn and before the rendition of its verdict, . . . the court finds, from facts unknown at the time of the selection of the jury, that a juror is *grossly unqualified* to serve in the case or has engaged in *misconduct of a substantial nature*, . . . the court must discharge such juror" (emphasis added; *compare* CPL 270.20 [1]). While the note was undoubtedly inappropriate, we agree with County Court that a mistrial was not required. Not only did the juror repeatedly assure the court that she could be fair, but she recognized the inappropriateness of her actions, apologized to all concerned and, more importantly, did not at any time express a predisposition towards any of the parties involved in the trial. County Court conducted an appropriate inquiry into the juror's ability to be fair and justified its conclusion that she was not of "a state of mind which would prevent the rendering of an impartial verdict" (*People v Lapage*, 57 AD3d 1233, 1235 [2008]; *see People v Anderson*, 70 NY2d 729, 730 [1987]; *People v Buford*, 69 NY2d 290, 299 [1987]; *People v Littebrant*, 55 AD3d 1151, 1153 [2008]). Therefore, a mistrial was not warranted.

Defendant next contends that County Court committed reversible error in its response to the jury's request for a supplemental instruction on the definition of recklessly (*see* Penal Law § 15.05 [3]). Specifically, defendant complains that County Court, in its response to the jury's inquiry, did not emphasize that the risk to be perceived had to be so serious that, if not avoided, it could result in the death of another person. In this regard, we note that County Court repeatedly advised the jury in its charge that to convict, the jury must be satisfied that defendant's conduct has served to create a "substantial and unjustified risk that another person's death will occur."

Defendant also takes exception to County Court's statement made in its supplemental charge that such risk involves "what [defendant] saw, what [*defendant*] *should have seen*, and what [defendant] disregarded" (emphasis added; *see* Penal Law § 15.05 [3]; §§ 120.25, 125.15 [1]). In effect, defendant contends that such phrasing constituted an incorrect statement of applicable law and instructed the jury to apply a less rigorous standard of proof than what is otherwise required for it to convict defendant of reckless manslaughter. In reviewing the court's instruction, "the challenged portions of the charge should not

---

7. There were no alternate jurors available.

be examined in a vacuum, but must be assessed in the context of the jury instructions in their entirety. An instruction 'may be sufficient, indeed substantially correct, even though it contains phrases which, isolated from their context, seem erroneous. The test is always whether the jury, hearing the whole charge, would gather from its language the correct rules which should be applied in arriving at [a] decision'·" (*People v Simmons*, 66 AD3d 292, 295 [2009] [citations omitted], quoting *People v Drake*, 7 NY3d 28, 33-34 [2006]). Inasmuch as the court stated twice that the recklessness of defendant's conduct depended upon what she was "aware" of and what she "consciously" disregarded, its instruction, when viewed in connection with its earlier charge, provided the jury with a proper answer to its question (*compare People v Neptune*, 51 AD3d 949, 950 [2008]).

Defendant challenges approximately 45 evidentiary rulings made by County Court and contends that each involved evidence that was either irrelevant, prejudicial or inadmissible as hearsay. We have reviewed every challenge and, in addition to finding that many are unpreserved due to defendant's failure to object to them, we also are of the view that they are without merit or do not amount to reversible error (*see People v Crimmins*, 36 NY2d 230, 242 [1975]; *People v Phillips*, 55 AD3d 1145, 1147-1148 [2008], *lv denied* 11 NY3d 899 [2008]).

Finally, inasmuch as the sentence that defendant received on the remaining manslaughter conviction must run concurrent to any sentence imposed for her conviction of reckless endangerment, the sentence as rendered by County Court must be modified accordingly (*see* Penal Law § 70.25 [2]; *People v Laureano*, 87 NY2d 640, 643 [1996]; *compare People v Ortega*, 245 AD2d 213, 214 [1997], *lv denied* 91 NY2d 1011 [1998]). In our view, the resulting sentence of 5 to 15 years, given the conduct encompassed by these convictions, is neither harsh nor excessive. Defendant's remaining contentions have been reviewed and found to be without merit.

Cardona, P.J., Peters, Stein and McCarthy, JJ., concur. Ordered that the judgments are modified, on the law, by reversing defendant's conviction of manslaughter in the second degree under count six of the indictment; dismiss said count and the sentence imposed thereon and direct that defendant's sentences on counts seven and eight of the indictment shall run concurrently to one another; and, as so modified, affirmed.