[953 NE2d 760, 929 NYS2d 522]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALICIA LEWIE, Appellant.

Argued May 3, 2011; decided June 9, 2011

## POINTS OF COUNSEL

*Matthew C. Hug*, Troy, for appellant. I. Appellant's indelible right to counsel was violated by the prosecution when the prosecutor, with full knowledge that appellant had been assigned an attorney in a simultaneous Family Court Act article 10 proceeding emanating out of the same nexus as the criminal investigation, and despite this knowledge, advised law enforcement to continue its interrogation. (*People v West*, 81 NY2d 370; *People v Harris*, 77 NY2d 434; *People v Settles*, 46 NY2d 154; *People v Bing*, 76 NY2d 331; *People v Grice*, 100 NY2d 318; *People v Di Biasi*, 7 NY2d 544; *People v Hobson*, 39 NY2d 479; *People v Skinner*, 52 NY2d 24; *People v Rogers*, 48 NY2d 167; *People v Bartolomeo*, 53 NY2d 225.) II. The Appellate Division's decision reversing and dismissing count six of the indictment charging appellant with manslaughter in the second degree pursuant to Penal Law § 125.15 (1) based upon its finding that the evidence was insufficient to establish that appellant was aware that her son was exposed to a grave risk of death and affirming appellant's conviction on count seven of the indictment charging appellant with manslaughter in the second degree pursuant to Penal Law § 125.15 (1) renders the verdict repugnant and requires reversal. (*People v Tucker*, 55 NY2d 1; *People v Dercole*, 72 AD2d 318; *People v Trappier*, 87 NY2d 55; *People v Raymond*, 56 AD3d 1306; *People v Reagan*, 94 NY2d 804.) III. County Court's inquiry of the "blue haired" juror was insufficient as a matter of law, rendering its decision to allow her to continue to deliberate reversible error. Moreover, simply based upon the juror's conduct and her responses to the court's terse inquiry, the court's decision not to remove her constituted reversible error. (*People v Branch*, 46 NY2d 645; *People v Buford*, 69 NY2d 290; *People v Anderson*, 70 NY2d 729; *People v Daniels*, 218 AD2d 589; *People v McClenton*, 213 AD2d 1; *People v Lapage*, 57 AD3d 1233; *People v Bradford*, 300 AD2d 685; *People v Leader*, 285 AD2d 823.) IV. Appellant's conviction for manslaughter in the second degree (count seven) was not supported by legally sufficient evidence. (*People v Raymond*, 56 AD3d 1306; *People v Stanfield*, 36 NY2d 467; *People v Reagan*, 94 NY2d 804; *People v Phippen*, 232 AD2d 790; *People v Stewart*, 40 NY2d 692; *People v Brengard*, 265 NY 100; *People v Wong*, 81 NY2d 600; *People v Northrup*, 83 AD2d 737.) V. Appellant's conviction

for reckless endangerment in the first degree was unsupported by legally sufficient evidence. (*People v Lynch*, 95 NY2d 243; *People v Roe*, 74 NY2d 20; *People v Feingold*, 7 NY3d 288; *People v Register*, 60 NY2d 270; *People v Chrysler*, 85 NY2d 413; *People v Gomez*, 65 NY2d 9; *People v Graham*, 14 AD3d 887; *People v Williams*, 191 AD2d 234; *People v Sanford*, 24 AD3d 572.) VI. County Court's supplemental jury instruction on the definition of recklessness was incorrect and had the effect of changing the charges pending and theory of the prosecution. (*People v Ladd*, 89 NY2d 893; *People v Drake*, 7 NY3d 28.) VII. The trial court's allowance of a mountain of hearsay and irrelevant, prejudicial and inflammatory evidence to be admitted at trial deprived appellant of her constitutional right to a fair trial. (*People v Wong*, 81 NY2d 600.)

*Kathleen B. Hogan, District Attorney*, Lake George (*Emilee B. Davenport* of counsel), for respondent. I. Since the appointment of counsel in Family Court did not effect the attachment of counsel in the criminal investigation, there is no basis for defendant's claim that her statements to Investigators Werner and Swartz were taken in violation of her indelible right to counsel. (*People v Roselle*, 84 NY2d 350; *People v Smith*, 62 NY2d 306; *Gilberg v Barbieri*, 53 NY2d 285; *People v Robinson*, 122 AD2d 173; *People v Le Blanc*, 199 AD2d 584; *People v Snyder*, 221 AD2d 870; *People v Kent*, 240 AD2d 772; *People v Townes*, 41 NY2d 97; *People v Yut Wai Tom*, 53 NY2d 44; *People v Samuels*, 49 NY2d 218.) II. The Appellate Division's reversal of defendant's conviction for manslaughter in the second degree under count six did not render the verdict of guilt under count seven repugnant since that count did not require the jury to find that defendant recklessly caused Colbi Bullock's death by failing to seek medical attention for him between November 11, 2007 and November 14, 2007. (*People v Tucker*, 55 NY2d 1.) III. County Court was not required to remove a juror where the juror unequivocally affirmed her ability to be fair and impartial. (*People v Buford*, 69 NY2d 290; *People v West*, 92 AD2d 620; *People v Anderson*, 70 NY2d 729; *People v Littebrant*, 55 AD3d 1151; *People v Smyers*, 167 AD2d 773, 77 NY2d 967; *People v Leader*, 285 AD2d 823, 97 NY2d 756; *People v Butts*, 140 AD2d 739; *People v Rodriguez*, 71 NY2d 214; *People v Rentz*, 67 NY2d 829; *People v Meyer*, 78 AD2d 662.) IV. The evidence adduced at trial, viewed in the light most favorable to the People, permitted the jury to find defendant guilty of manslaughter in the second degree under count seven of the indictment and reckless endangerment in the first degree. (*People v Bleakley*, 69 NY2d

490; *People v Foster*, 64 NY2d 1144; *People v Licitra*, 47 NY2d 554; *People v Steinberg*, 79 NY2d 673; *People v Wong*, 81 NY2d 600; *People v Northrup*, 83 AD2d 737; *People v Salley*, 153 AD2d 704; *People v Stubbs*, 122 AD2d 91; *People v Feingold*, 7 NY3d 288; *People v Suarez*, 6 NY3d 202.) V. County Court's supplemental jury instruction on recklessness sufficiently conveyed the correct principles and therefore does not mandate a reversal of defendant's conviction. (*People v Ladd*, 89 NY2d 893; *People v Russell*, 266 NY 147; *People v Drake*, 7 NY3d 28; *People v Simmons*, 15 NY3d 728; *People v Neptune*, 51 AD3d 949; *People v Crimmins*, 36 NY2d 230.) VI. The testimony permitted at trial was entirely proper and the Appellate Division correctly found that defendant's claims of error were either unpreserved, lacking in merit or harmless. (*People v Clarke*, 81 NY2d 777.)

*Derek Champagne, District Attorney*, Albany (*Morrie I. Kleinbart* of counsel), for District Attorneys Association of the State of New York, amicus curiae. The due process basis of the right to counsel in Family Court removal proceedings counsels against establishing an indelible right to counsel in a criminal proceeding arising from a common nucleus of facts. (*People v Smith*, 62 NY2d 306; *People v Lopez*, 16 NY3d 375; *People v Donovan*, 13 NY2d 148; *People v Noble*, 9 NY2d 571; *Patterson v New York*, 432 US 197; *Medina v California*, 505 US 437; *Matter of Ella B.*, 30 NY2d 352; *Mathews v Eldridge*, 424 US 319; *Matter of Tammie Z.*, 66 NY2d 1; *Morrissey v Brewer*, 408 US 471.)

## OPINION OF THE COURT

Smith, J.

A jury convicted defendant of second degree manslaughter and first degree reckless endangerment for her role in the events leading to the death of her son. In so doing, the jury found that defendant acted both recklessly and with depraved indifference to human life. We hold that the record supports the jury's finding as to the first of these mental states, but not the second. We therefore uphold the conviction for manslaughter and vacate the conviction for reckless endangerment.

I

On November 13, 2007, defendant and the man she lived with, Michael Flint, brought her eight-month-old son, Colbi Bullock, to a hospital emergency room. The child was not breathing and had no pulse. Attempts to resuscitate him did not succeed, and he was pronounced dead the following day.

At the time of his death, Colbi had injuries consistent with very severe abuse. There were many bruises on his face—around his cheek, his chin, both eyes and one ear—and there were also bruises elsewhere on his head, and on his neck, chest and abdomen. There were patterns of bruises and abrasions on his arms consistent with three human bite marks, two on the right arm and one on the left. The injuries on his neck were consistent with choking. His ribs had been broken at least a month previously; this injury was consistent with squeezing, or grabbing and shaking. It also appeared that the ribs had been reinjured more recently. A bone in the forearm had been recently broken, close to a bite mark. A doctor who conducted an autopsy found that injury to be "consistent with someone biting and snapping the arm at the same time." He also found evidence of a brain injury, in the form of hemorrhages less than four days old. In the doctor's opinion, the brain injury was the cause of death.

It is not disputed that Colbi's injuries were inflicted by Michael Flint. Flint pleaded guilty to two counts of depraved indifference murder, and related lesser charges. Defendant was prosecuted on two counts of second degree manslaughter based on two different theories: that, in the last two or three days of Colbi's life, she knew he had life-threatening injuries and failed to seek medical help; and that, in the last 45 days of his life, she left him in Flint's care, knowing that to do so was to put the child's life in danger. She was also charged with first degree reckless endangerment and with endangering the welfare of a child.

Defendant was convicted on all four counts. The Appellate Division reversed as to the first manslaughter count, finding that the evidence did not establish defendant's knowledge that the injuries the child had received were life-threatening, and otherwise affirmed (*People v Lewie*, 67 AD3d 1056 [3d Dept 2009]). A Judge of this Court granted defendant leave to appeal (14 NY3d 889 [2010]). We now affirm as to the manslaughter and endangering the welfare of a child counts, but reverse as to reckless endangerment.

## II

The People have not challenged the Appellate Division's holding that the evidence was insufficient on the first of the two manslaughter counts, and defendant does not dispute the sufficiency of the evidence that she was guilty of endangering the welfare of a child. She does challenge the sufficiency of the

evidence supporting her remaining manslaughter conviction and her conviction for reckless endangerment. As to both counts, the critical question is what the evidence shows as to defendant's state of mind when, over a period of six weeks, she repeatedly left her baby with the man who abused and eventually killed him. We will summarize the evidence on that issue, resolving any conflicts, as the jury presumably did, in the People's favor.

Defendant and Colbi began living with Flint when Colbi was about three months old. Defendant worked full time; she hired a babysitter, but Flint was often alone with Colbi. A few days before Colbi's death, defendant dismissed the babysitter and agreed with Flint that Flint would care for the child while defendant worked.

Seven friends and acquaintances of defendant testified to contacts with defendant, Flint and Colbi during the time the three of them lived together. Five of them said that they saw bruises on Colbi, and six of them said that defendant expressed, in one way or another, knowledge, belief or fear that Flint was abusing the child. One said that defendant told her "how she felt uncomfortable leaving the baby home with Michael, that she was scared, she never knew what she was going to go home to." The same witness said defendant "told me that Michael had shaken the baby . . . shaken and bit him." Another witness recounted a conversation between defendant and Flint, as defendant described it to the witness: "she had told him he had to be more careful with Colbi . . . and if he happened to get angry or upset, to shake the teddy bear instead of Colbi." (In a statement to police after Colbi's death, defendant admitted telling Flint something quite similar.) A third witness said that Flint had shown the witness some bruises on Colbi's head and that, when defendant learned of the conversation, she "walked over to Michael and started yelling at him . . . . She asked him why he pointed out the bruises to me."

Three witnesses said they had told defendant to call the police, leave the apartment or both. A fourth told her that the idea of Flint as babysitter "scared me and made me quite nervous for Colbi," and a fifth, when defendant told him that Flint would be babysitting, observed: "You're nuts."

There was other evidence that defendant knew Flint could be violent and cruel. Three witnesses testified that defendant told them Flint had abused her physically: one said that, according to defendant, Flint had shoved, hit and bitten her; another that

defendant had "bruises . . . that she said [were] from Michael"; and a third that she had "bruises and a burn" that she said "were from Mike." Two witnesses testified that defendant knew Flint had been charged with cruelty to a dog, and one said that she had "started to believe" he was guilty of that crime. The same witness testified that, according to defendant, Flint had once kicked a kitten against a wall; defendant later found the kitten dead; and "she believed Michael had killed the cat."

The events of the last days of Colbi's life, while directly relevant to the dismissed manslaughter count (based on failure to seek medical care), also have some bearing on the counts before us, because they show defendant's persistence in leaving Colbi with a dangerous man. Flint called defendant at work on November 12 to tell her that "the baby had fallen in the shower." Defendant reported this to a coworker who was a certified nursing assistant, and received advice about what symptoms to look for. Arriving home, defendant found, according to her statement to the police, that Colbi "had bruising on the side of his face, his eyes were black and blue, he had a fat lip, and he had redness on his torso and his neck area." Flint told her the baby had vomited—one of the symptoms the coworker had identified as calling for medical attention.

Defendant not only sought no care for the baby; there was evidence that she tried to conceal the injuries. A witness who encountered Colbi, Flint and defendant the following morning, before defendant went to work, testified that her attention was drawn by Colbi's "persistent, weak . . . very strange cry." Colbi was dressed in a snowsuit, with a hood covering his head (though defendant herself wore a T-shirt). When the witness slid the hood back, she saw that Colbi had two black eyes, and asked defendant: "Did you take him to the hospital?" Defendant replied, falsely, that she had been at the hospital all night, and that the doctor had told her that the baby was fine. Later that day, defendant went to work as usual, leaving Colbi with Flint for the last time.

We must decide whether this evidence shows the degree of culpability necessary to support defendant's manslaughter and reckless endangerment convictions. We consider the two separately.

## Manslaughter

Defendant was convicted of manslaughter in the second degree, a class C felony, under Penal Law § 125.15 (1), applicable to someone who "recklessly causes the death of another

person." "Recklessly" is defined in Penal Law § 15.05 (3), which says, in relevant part:

"A person acts recklessly with respect to a result . . . when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur . . . The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

The question here is whether the jury could find, beyond a reasonable doubt, that defendant was aware of, and consciously disregarded, a substantial and unjustifiable risk that leaving Colbi in Flint's care would lead to Colbi's death. It is not enough that defendant should have known the child's life was in danger, or that she did know the child could be seriously hurt. She must have actually known of, and consciously disregarded, a risk to the child's life (*see People v Wong*, 81 NY2d 600, 608 [1993]). On the other hand, it is not necessary to a manslaughter conviction that defendant knew the child would die, or believed it likely. Even a small risk that a baby will die of child abuse is "substantial and unjustifiable."

We conclude that the evidence is sufficient to support the jury's finding that defendant knew such a risk existed. The evidence shows that defendant knew, or at least believed it possible, that Flint was hitting, shaking and biting her child. She knew that he was capable of inflicting significant injury on an adult, herself. She believed him capable of killing a small animal in a rage. She was worried enough to tell Flint that, if he was angry, he should "shake the teddy bear instead of Colbi." Yet, she left Colbi with Flint again and again—even after she saw, on November 12 and 13, that Colbi had been seriously hurt.

It is, perhaps, conceivable that defendant did not actually know that Flint's maltreatment of Colbi created a risk to the child's life, but the jury could rationally find that she did know it. The dissent, in concluding otherwise, proceeds on the mistaken premise that "[w]e know" from the Appellate Division's dismissal of the first manslaughter count that defendant perceived no substantial and unjustifiable risk to Colbi's life during the child's last three days (dissenting op at 367). In fact, the dismissal establishes only that the People failed to prove defendant knew the injuries Colbi had *already* received

were life-threatening. There is no inconsistency in holding, as the Appellate Division correctly did, that the People presented sufficient evidence that defendant knew—before and during the last days of Colbi's life—of a substantial and unjustifiable risk that Flint *would* injure him fatally.

Having found that defendant knew of that risk, the jury was also justified in finding that she consciously disregarded it. And it is obvious that the risk was "of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." The evidence was therefore sufficient to support defendant's conviction for manslaughter in the second degree.

### Reckless Endangerment

Reckless endangerment in the first degree is defined by Penal Law § 120.25: "A person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person."

This crime, a class D felony, is less serious than manslaughter in the second degree. Yet the mental culpability necessary to support defendant's reckless endangerment conviction is greater than that required to support her manslaughter conviction: to be guilty on the reckless endangerment count, she must have acted not only recklessly, but also with depraved indifference to human life.

The reason for this apparent anomaly is an exercise of prosecutorial discretion. The People chose not to charge defendant with depraved indifference murder, though such a charge has just as much basis in the record as the charge of first degree reckless endangerment. The definition of depraved indifference murder contained in Penal Law § 125.25 (2) is identical to the definition of reckless endangerment that we have quoted, except that the murder statute adds the words "and thereby causes the death of another person." Here, of course, the person who was put at risk did die, and indeed the jury, in convicting defendant of manslaughter, so found. Thus the jury that convicted defendant on the reckless endangerment count would, if it was logically consistent, also have convicted her of depraved indifference murder had that charge been presented to it. And we cannot uphold her reckless endangerment conviction unless we would uphold a murder conviction on the same facts.

The distinction between conscious disregard of a known risk to human life (required for a reckless manslaughter conviction)

and depraved indifference to human life (required for a depraved indifference murder or first degree reckless endangerment conviction) can be hard to grasp, especially in a disturbing case like this one. Consciously to disregard a substantial risk to the life of one's own child—as the jury found, on legally sufficient evidence, this defendant did—is shocking behavior, and in ordinary speech people might call it "depraved." But "depraved indifference to human life," as used in the murder and reckless endangerment statutes, is something even worse.

Our cases make clear that the word "indifference" is to be taken literally: "depraved indifference is best understood as an utter disregard for the value of human life—a willingness to act . . . because one simply doesn't care whether grievous harm results or not" (*People v Feingold*, 7 NY3d 288, 296 [2006], quoting 7 NY3d at 298 [Ciparick, J., dissenting], quoting *People v Suarez*, 6 NY3d 202, 214 [2005]). In other words, a person who is depravedly indifferent is not just willing to take a grossly unreasonable risk to human life—that person does not care how the risk turns out. This state of mind is found only in "rare cases" (*Suarez*, 6 NY3d at 218-219 [G.B. Smith, Rosenblatt and R.S. Smith, JJ., concurring]). Such cases do exist; in the situation before us, Flint pleaded guilty to depraved indifference murder, and we do not suggest that his plea was ill-founded. But depraved indifference to the life of another is still rare, and it is surely even rarer when the other person is one's own child.

■ Here, while the evidence certainly shows that defendant cared much too little about her child's safety, it cannot support a finding that she did not care at all. On the contrary, the evidence shows that defendant feared the worst and—recklessly, as the jury found—hoped for the best. A witness who unsuccessfully advised defendant to call the police about Flint's behavior testified that defendant seemed "worried," and no witness's testimony points to a contrary finding. Some of the evidence most damaging to defendant on the manslaughter count is actually favorable to her on the depraved indifference issue. Thus her statement that she "was scared" and "never knew what she was going to go home to" shows that she was fearful of harm to her baby, not that she was indifferent to the possibility. And in telling Flint to "shake the teddy bear instead of Colbi," she was trying, however weakly and ineffectively, to protect the child.

There is, it is true, evidence that defendant not only knew of, but tried to conceal, Flint's abuse of the child. She chastised

Flint for showing someone Colbi's bruises and, in the last hours of Colbi's life, she tried to hide his injuries and lied to minimize their severity. Even this, however, does not show—and nothing in the record shows—that defendant did not care whether Colbi lived or died. Trying to cover up a crime does not prove indifference to it.

In short, while the evidence is sufficient to support the jury's finding that defendant was guilty of manslaughter, it would not support a conviction for the even more serious crime of depraved indifference murder. Perhaps the People implicitly recognized this when they decided not to bring a murder prosecution— even though they asked the jury to find all the elements of depraved indifference murder. Since a murder conviction could not stand on this record, as a matter of logic the conviction of depraved indifference reckless endangerment cannot stand either.

### III

Defendant suggests several other reasons for reversal. We reject them all; three warrant some discussion.

First, defendant claims that one of several statements that she gave to the police after Colbi's death should have been suppressed because it was taken in violation of her "indelible" right to counsel (*see generally People v Lopez*, 16 NY3d 375, 377 [2011]; *People v Bing*, 76 NY2d 331 [1990]). That right attached, defendant says, when counsel was appointed for her in a Family Court proceeding, hours before Colbi was officially pronounced dead. Though the child was, according to the first doctor who saw him, "moribund" and "essentially deceased" when he arrived at the hospital on November 13, a vain effort to resuscitate him continued for almost 24 hours. During that time, a proceeding was begun to remove Colbi from defendant's home, and Family Court appointed a Legal Aid lawyer to represent defendant. The People were notified of the appointment at 4:06 P.M. on November 14; Colbi was declared dead, thus mooting the Family Court proceeding and ending the attorney-client relationship, at 6:18 P.M. During that two-hour interval, defendant, who had previously received *Miranda* warnings and agreed to speak to the police, continued answering their questions. She now says that the questioning should have stopped when the People received notice that she was represented by counsel.

■ We have never held, and we now reject the argument, that the indelible right to counsel can attach by virtue of an attorney-client relationship in a Family Court or other civil proceeding.

The indelible right, as Judge Kaye's concurring and dissenting opinion in *Bing* explained, has "at its core the perception that in criminal cases—*wholly unlike civil cases*—the presence of an attorney is the most effective means we have of minimizing the disadvantage at which an accused is placed when . . . directly confronted with the awesome law enforcement machinery possessed by the State" (76 NY2d at 351 [internal quotation marks omitted and emphasis added]). Thus while an attorney-client relationship formed in one criminal matter may sometimes bar questioning in another matter in the absence of counsel (*see Lopez*, 16 NY3d at 380), a relationship formed in a civil matter is not entitled to the same deference.

*People v Townes* (41 NY2d 97 [1976]), on which defendant relies, is distinguishable. There, an attorney-client relationship was formed in a criminal proceeding: "the defendant was arraigned in criminal court and counsel was assigned by order of that court" (*id.* at 99). A police officer then interviewed the defendant, in the absence of counsel, in connection with a complaint the defendant had filed with the Civilian Complaint Review Board, and the People sought to use the resulting statements in the criminal case. We held that the criminal and Review Board proceedings were so closely related that the indelible right, which attached when an attorney-client relationship was formed in the criminal case, barred questioning in the non-criminal one. But here no relationship was formed in a criminal case, and no indelible right ever attached.

Secondly, defendant argues that the trial court erred in its response when, during jury deliberations, one of the jurors sent an odd and inappropriate note asking for the opportunity to thank all concerned, after the verdict was rendered, for the privilege of serving. The note mentioned, among other things, the breakup of the juror's marriage and her view that the male lawyer who sat in the second chair at the prosecution table was a "Cutie"; the juror asked, perhaps jokingly, to be given that lawyer's telephone number when the trial was over.

We think the trial judge handled this problem quite skillfully. After disclosing the note to counsel and discussing it with them, he interviewed the juror in counsel's presence; explained to her gently that the note was inappropriate; and obtained her assurance that nothing, including her favorable impression of a prosecutor, would prevent her from being fair to both sides. Nothing in the interview, or in the note itself, suggests that the

juror was biased. Indeed, she made clear that her gratitude for the opportunity to serve extended not only to the judge and both sides' lawyers, but to defendant personally. Defendant argues in substance that the juror's note and her comments during the dialogue in chambers show that the juror had an eccentric personality, but eccentrics are not barred from serving on juries. Under CPL 270.35 (1), a sworn juror may be discharged only if the court finds that she "is grossly unqualified to serve . . . or has engaged in misconduct of a substantial nature." This juror was not grossly unqualified and engaged in no substantial misconduct. There was no reason for the trial judge either to discharge her or to make further inquiry.

Thirdly, defendant complains of five words in the trial court's response to a juror's question during deliberations about the meaning of recklessness. In its original charge, the court defined that term twice, once in explaining the elements of manslaughter and again in explaining the elements of reckless endangerment. The court's definition tracked the language of Penal Law § 15.05 (3), and defendant does not complain of it. After retiring to deliberate, the jury asked several times for the definition to be reread, and the court obliged. Later, in response to a jury note, the court gave a slightly expanded version of the definition, not changing its substance but separating it into three components—awareness of a risk, conscious disregard of the risk, and gross deviation from a reasonable person's standard of conduct. This supplemental charge, also, is not now challenged.

After some other supplemental instructions were given, a juror asked for further explanation of recklessness, saying: "Are we supposed to do [sic] consider how the Defendant is thinking or what a reasonable person would think?" After a discussion with counsel outside the jury's presence, the court replied that recklessness "requires both of those things." The judge again took the jury through the three components of recklessness, summarizing the second—conscious disregard of a known risk—in this way:

> "Then the second part is required as well. So, besides the first part, the second part must be that he or she—in this case, the Defendant—was aware of and consciously disregarded the risk. So, that goes to the particular person, what they saw, *what they should have seen*, and what they disregarded" (emphasis added).

The court concluded its response to the juror's question by saying:

"So, long and short answer to your question is both of those things come in: What the individual Defendant's aware of, and what she or he consciously disregards; and then secondly, whether that risk that they're aware of deviated from—constitutes a gross deviation from the standard that a reasonable person would observe."

It is undisputed that, in including the words "what they should have seen" in its description of conscious disregard, the court misspoke. The jury was required to consider what risk defendant actually perceived and disregarded, not what she should have perceived. Indeed, when this supplemental charge is examined minutely, the words "should have seen" do not make sense; it is not possible "consciously" to disregard something one "should have" seen but did not.

In evaluating a jury charge, however, we are "not limited to the appropriateness of a single remark" (*People v Umali*, 10 NY3d 417, 426 [2008]). Rather, we examine "the context and content of the entire charge" (*id.* at 427) and determine whether "the instruction as a whole . . . was likely to confuse the jury" (*People v Fields*, 87 NY2d 821, 823 [1995]). We are satisfied that the minor error in the supplemental charge here created no significant risk of confusion. The jurors had already heard, several times, a completely correct explanation of recklessness as defined in the Penal Law. The juror's specific question—should the jury consider what defendant actually thought, or what a reasonable person would have thought—was concisely answered at the beginning and end of the supplemental charge with the word "both." And the supplemental charge as a whole makes clear that the jury must consider both the risk defendant actually perceived and disregarded, and what a reasonable person in her situation would have done. The supplemental charge, taken as a whole, was proper.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be modified by vacating defendant's conviction for reckless endangerment in the first degree, dismissing that count of the indictment and remitting the matter to County Court for resentencing, and as so modified affirmed.

JONES, J. (dissenting in part). I agree with the majority's dismissal of the reckless endangerment count. However, I dissent

from that portion of the majority's opinion upholding defendant's conviction for manslaughter in the second degree (count seven of the indictment) because I do not believe this conviction was supported by legally sufficient evidence.

In a legal sufficiency inquiry, this Court's role is limited to determining whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (*Jackson v Virginia*, 443 US 307, 319 [1979]; *see also People v Contes*, 60 NY2d 620, 621 [1983]). Where the evidence adduced at trial establishes "any valid line of reasoning and permissible inferences [that] could lead a rational person" to convict, then the conviction survives sufficiency review (*People v Williams*, 84 NY2d 925, 926 [1994]). "A sufficiency inquiry requires a court to marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" (*People v Danielson*, 9 NY3d 342, 349 [2007]).

Penal Law § 125.15 (1) provides that a "person is guilty of manslaughter in the second degree when . . . [h]e *recklessly causes* the death of another person" (emphasis added). Penal Law § 15.05 (3) defines the term "recklessly" as follows:

"A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

Thus, the elements of second-degree manslaughter are "the creation of a substantial and unjustifiable risk [of death]; an awareness and disregard of the risk on the part of defendant; and a resulting death" (*People v Licitra*, 47 NY2d 554, 558 [1979]).

Our case law makes clear that causation is "an essential element which the People must prove beyond a reasonable doubt" in a second-degree manslaughter prosecution (*People v Stewart*, 40 NY2d 692, 697 [1976]). That is, "the defendant's actions must be a *sufficiently direct cause* of the ensuing death" (*id.*). If the evidence only establishes a possible or probable connection between defendant's acts and the victim's death, the evidence is not legally sufficient to support a conviction for second-degree manslaughter (*see id.*).

Defendant Alicia Lewie is not alleged to have herself ever physically abused her child. She is accused of recklessly causing the death of her eight-month-old son by repeatedly leaving him in her live-in boyfriend's (Michael Flint) unsupervised care during a 45-day period prior to the child's death (between October 1, 2007 and November 14, 2007), despite being aware that Flint was physically abusing the child. Because she is a "passive" defendant charged with reckless manslaughter, this Court's decision in *People v Wong* (81 NY2d 600 [1993]) has application. In *Wong*, both caretakers of an infant who died of shaken baby syndrome were convicted of first- and second-degree manslaughter and endangering the welfare of child, even though there was no evidence as to which of the caretakers shook the child. In reversing the convictions, this Court held that the prosecution had to establish that the passive defendant was personally aware that the physical abuse had taken place *and "that such abusive conduct created a risk that the infant would die without prompt medical treatment"* (*Wong*, 81 NY2d at 608 [emphasis added]; *see People v Northrup*, 83 AD2d 737 [3d Dept 1981]). In *Northrup*, defendant mother was convicted in Otsego County Court of depraved indifference murder stemming from the death of her son at the hands of her live-in boyfriend, who physically abused the child. Defendant was charged with causing her son's death by unjustifiably and inexcusably failing to obtain or provide medical care or assistance for him. In reversing this conviction on legal sufficiency grounds, the Appellate Division wrote:

> "Evidence is lacking that this 23-year-old woman, without medical training or knowledge, was cognizant of that risk [of death] and consciously disregarded it. Although the external injuries were serious, [her son] ceased crying and walked about without complaining shortly after [her boyfriend] left. *Particularly noteworthy is the fact that the injury causing his death was an internal one, not detectable from observing the boy's body. In our view, this record does not support a finding that defendant acted recklessly"* (*Northrup*, 83 AD2d at 738 [emphasis added]).

The *Northrup* court further stated, "[s]ince reckless conduct is also a requisite for manslaughter in the second degree, one of the lesser included offenses which was charged, defendant's conviction of that crime must likewise be ruled out" (83 AD2d at 738).

The prosecution here built its reckless manslaughter case around the allegation that sometime during the stated 45-day period, defendant actually became aware that Flint was physically abusing her son and chose to ignore the grave risk this conduct posed for the child by repeatedly leaving him in Flint's unsupervised care. To make out its case, the prosecution had witnesses testify that defendant told them that Flint, on numerous occasions, had physically abused her and was physically abusing her child in her absence. Further, the prosecution proffered medical evidence which confirmed that defendant's son had been repeatedly abused during the period of time that defendant left him in Flint's unsupervised care.

While this evidence may have shown that defendant was criminally negligent in leaving her child with Flint, it did not establish the elements necessary to support a reckless manslaughter conviction.* The evidence, when viewed in the light most favorable to the prosecution, established that the acts of abuse took place while defendant was at work—i.e., defendant could not know the severity of the abuse to the child; it was not possible for defendant to know that the injuries sustained by her child were life-threatening or could contribute to his death because to the naked eye they only appeared to be marks or bruises; hospital personnel were only able to determine the extent of the child's internal injuries after multiple X rays and blood tests were performed; and the internal injuries that caused the child's death were only detected upon the medical examiner's internal inspection of the child's remains during the postmortem examination. Further, while the evidence established that the child's death resulted from trauma to the head, the medical examiner was unable to pinpoint precisely when the trauma was inflicted upon the child. He could only opine that the fatal injuries were sustained within four days prior to his death (which occurred on November 14, 2007).

While the evidence adduced at trial established that defendant was aware of a risk of abuse to her son, the prosecution did not meet its burden of establishing defendant's awareness and conscious disregard of a substantial and unjustifiable risk of her son's death. There was no evidence to establish at what point

---

* Viewing this evidence in conjunction with the trial court's supplemental instruction to the jury explaining recklessness in terms of what defendant saw, *what defendant should have seen*, and what defendant disregarded, a reasonable argument could be made that the jury convicted defendant of reckless manslaughter based on proof of criminally negligent homicide.

during the stated 45-day period defendant actually perceived that her child was exposed to a substantial and unjustifiable risk of death. We know from the unchallenged dismissal of the reckless manslaughter count under count six of the indictment that the jury could not rationally find that defendant perceived this risk during the last three days of her son's life, the last three days of the stated 45-day period. We further know from the dismissal of count six that the jury could not rationally find that defendant perceived this risk when during the three days covered by that count she left her child in Flint's care when she left for work. Nor was there evidence that defendant would have disregarded a substantial and unjustifiable risk to her child's life even had one been apparent. Her actions—on November 12 and 13, 2007—with respect to her child—i.e., attempting to treat him with over-the-counter medications, feeding and playing with him, checking on him throughout the night, and when it became apparent that his condition worsened, calling 911 and taking him to the hospital—belie the allegation that she would have consciously disregarded a substantial and unjustifiable risk to her child's life.

Moreover, the evidence adduced by the prosecution did not prove that defendant was aware that Flint's abusive conduct created a risk that defendant's child would die without prompt medical treatment (see Wong, 81 NY2d at 608). As stated supra, it was not possible for defendant to know that the injuries sustained by her child were life-threatening or could contribute to his death. Further, there was no proof demonstrating that defendant's acts (of leaving the child with Flint) or omissions were a sufficiently direct cause of the child's death (see Stewart, 40 NY2d at 697).

In upholding defendant's reckless manslaughter conviction, the majority concludes that the jury could logically find, based on the evidence adduced at trial, that defendant knew a substantial and unjustifiable risk of death existed and consciously disregarded it (see majority op at 357). But, in support of the inference it claims the jury could make, the majority points to evidence of defendant's awareness of a risk of physical abuse, not death. Stated differently, the majority, without support, equates knowledge of a risk of physical abuse with knowledge of a risk of death. In effect, the majority has held that once a parent is aware his/her child has been physically abused by someone with whom they regularly leave the child, even where the abuse occurs outside the presence of the parent, and even

where any injuries sustained appear to be superficial, that parent may be held criminally liable for reckless manslaughter if the child dies at the hands of the abusive caregiver. Such a ruling marks an unwarranted departure from our jurisprudence and a drastic diminution of the proof required to make out reckless manslaughter in a case involving a passive defendant parent. Indeed, the majority's holding appears to read the very stringent direct causation requirement out of the reckless manslaughter statute in cases involving passive defendant parents.

For the foregoing reasons, I would modify by dismissing count seven of the indictment charging reckless manslaughter and by dismissing count eight of the indictment charging reckless endangerment.

Judges CIPARICK, GRAFFEO, READ and PIGOTT concur with Judge SMITH; Judge JONES dissents in part and votes to modify by dismissing count seven of the indictment charging manslaughter in the second degree and by dismissing the count charging reckless endangerment, in a separate opinion in which Chief Judge LIPPMAN concurs.

Order, insofar as appealed from, modified, etc.