■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LACEY SPEARS, Appellant. [63 NYS3d 66]—

Appeal by the defendant from a judgment of the Supreme Court, Westchester County (Neary, J.), rendered April 8, 2015, convicting her of murder in the second degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial of that branch of the defendant's omnibus motion which was to suppress physical evidence.

Ordered that the judgment is affirmed.

Following the death of the defendant's five-year-old son (hereinafter the child), the defendant was indicted by a grand jury on one count of murder in the second degree (depraved indifference murder of a child), and one count of manslaughter in the first degree.

At trial, the People's evidence demonstrated that when the child was an infant, he had surgery which included the placement of a gastrointestinal tube (hereinafter a G-tube) in his stomach so that liquid nutrition could be administered. When the child started nursery school, the defendant took him to a gastroenterologist who questioned whether the child still needed the G-tube, but the defendant never had it removed. She reported that she continued to use it to provide the child with liquid nutrition overnight, although three of the defendant's friends and the child's teacher each testified that the child had a good appetite and ate normally when in their care.

During the course of the child's life, the defendant took him to a variety of doctors and hospitals, and repeatedly reported that the child had certain medical conditions that had been

ruled out by other physicians. The defendant also reported on numerous occasions to the child's teachers and doctors that the child was suffering from serious illnesses, which illnesses were never confirmed.

On January 17, 2014, the child's teacher stopped by the defendant's apartment. She noticed a feeding bag attached to a pole in the middle of the room and the child on the couch seemingly uncomfortable. Shortly after the teacher left, the defendant called her friend and reported that the child was having a seizure. The friend, upon arriving at the defendant's apartment, observed the child hooked up to a feeding bag. The defendant and her friend brought the child to Nyack Hospital where the defendant reported that the child had experienced three episodes that the defendant believed to be seizures.

The child was admitted to the hospital so that a video electroencephalogram (hereinafter EEG) could be performed to rule out a seizure disorder. A video camera was placed facing the child's hospital bed to record any physical symptoms of seizures that he may exhibit, and it recorded approximately 42 hours of footage. The footage from January 19, 2014, showed the defendant and the child entering the bathroom in the hospital room, and the defendant walking towards the bathroom area carrying a white cup and what appeared to be an attachment that connected to the child's G-tube. The child exited the bathroom and became ill shortly after, dry heaving, complaining of a severe headache, and suffering from diarrhea. After the child recovered from this episode, the footage shows the defendant and the child again entering the bathroom, and the defendant carrying a white cup and what appeared to be the attachment to his G-tube. Again, the child displayed the same symptoms, and then began to exhibit what the staff at Nyack Hospital originally thought were signs of a seizure. However, the EEG did not show seizure activity, but, rather, a significant slowing in the brain waves, which suggested a severe brain dysfunction.

A blood test conducted shortly thereafter showed abnormally high sodium and chloride levels. The child, who could no longer breathe on his own, was airlifted to a different hospital where he was diagnosed with hypernatremia (an elevated sodium level) of unknown etiology. Approximately two days later, the child suffered cerebral edema and herniation of the brain stem, and it was determined that he was brain dead.

Before and throughout the child's last hospital admission, the defendant sent many texts to friends reporting on the child's actual and purported health problems, indicating her

worry for him, and asking the recipients to pray for the child. The information in the texts was often unconfirmed or contradicted by the evidence from the physicians who had treated him. The defendant also posted photos of the child on Facebook, including photos taken after the child suffered cerebral edema and she was told that he would not likely recover.

After the child's death, a treating physician called Child Protective Services because he believed, upon consulting with multiple specialists in a variety of disciplines, that the child's hypernatremia was caused by introduction of salt into his G-tube. Following an autopsy, the medical examiner reached a similar conclusion. The People also presented the testimony of a medical expert who agreed with the conclusion of the treating physician and the medical examiner, and opined that if the child's treating doctors had known that he suffered from hypernatremia caused by exogenous sodium, the treatment would have been different. Further testimony was offered from a physician who had treated the child for unexplained hypernatremia when he was 2½ months old, to demonstrate the defendant's awareness of the previous incident. Moreover, the People presented evidence that three days before the child's last hospital admission, searches had been performed on the defendant's phone of "Normal Sodium Levels for a Child" and "Dangers of High Sodium Levels in a Child." Finally, police officers discovered two open containers of salt in the defendant's kitchen, and testing of two feeding bags taken from the defendant's apartment revealed high levels of sodium.

Upon the foregoing evidence, the defendant was convicted of depraved indifference murder of a child (*see* Penal Law § 125.25 [4]), and sentence was imposed.

The defendant's contention that the evidence was legally insufficient to prove beyond a reasonable doubt that she caused her son's death is unpreserved for appellate review (*see* CPL 470.05 [2]). In any event, contrary to the defendant's contention, viewing the evidence in the light most favorable to the People (*see People v Contes*, 60 NY2d 620, 621 [1983]), we find that the evidence was legally sufficient to establish the defendant's guilt beyond a reasonable doubt.

Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (*see* CPL 470.15 [5]; *People v Danielson*, 9 NY3d 342, 348 [2007]), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (*see People v Mateo*, 2 NY3d 383, 410 [2004]; *People v Bleakley*, 69 NY2d 490 [1987]). Upon reviewing the record here, we are

satisfied that the verdict of guilt was not against the weight of the evidence (*see People v Romero*, 7 NY3d 633 [2006]).

More specifically, we conclude that, contrary to the defendant's contention, the evidence, when properly weighed, demonstrated beyond a reasonable doubt that the defendant acted under circumstances evincing a depraved indifference to human life. Depraved indifference to human life is a culpable mental state that is "best understood as an utter disregard for the value of human life" (*People v Feingold*, 7 NY3d 288, 296 [2006] [internal quotation marks omitted]; *see People v Barboni*, 21 NY3d 393, 400 [2013]). It "comprises both depravity and indifference" (*People v McMillon*, 31 AD3d 136, 139 [2006]), such that "a person who is depravedly indifferent is not just willing to take a grossly unreasonable risk to human life—that person does not care how the risk turns out" (*People v Lewie*, 17 NY3d 348, 359 [2011]; *see People v Barboni*, 21 NY3d at 400).

"A defendant may be convicted of depraved indifference murder when but a single person is endangered in only a few rare circumstances," including when a defendant "engages in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim" (*People v Suarez*, 6 NY3d 202, 212 [2005]; *see* Penal Law § 125.25 [4]). Here, the evidence demonstrated that the defendant subjected the child to such a "brutal, prolonged and ultimately fatal course of conduct" (*People v Suarez*, 6 NY3d at 212; *see People v Barboni*, 21 NY3d at 402-404). In particular, the evidence showed that the defendant's course of conduct against the child in January 2014 included repeatedly sickening him and subjecting him to pain, to the point where he became unable to breathe on his own and, eventually, became brain dead (*see People v Barboni*, 21 NY3d at 401-402). The People established that the defendant introduced salt into the child's G-tube on more than one occasion, despite being aware of its effect on the child's condition, and never informed the doctors of the cause of his symptoms as they struggled to treat him (*see id.* at 402). This and other evidence of the defendant's conduct, including the manner in which she presented herself and the situation to others, demonstrated her fixation on garnering attention and sympathy for herself, and her utter indifference to the life of the child. Thus, although depraved indifference to the life of another is "rare" and "surely even rarer when the other person is one's own child" (*People v Lewie*, 17 NY3d at 359), under the unique circumstances of this case, the mens rea of depraved indifference to human life was proven beyond a reasonable doubt (*see People*

*v Thomas*, 22 NY3d 629, 635-636 [2014]; *People v Barboni*, 21 NY3d 393 [2013]; *People v Snyder*, 91 AD3d 1206 [2012]).

Contrary to the defendant's contentions, the Supreme Court properly denied her motion to suppress the evidence taken from her cell phone seized pursuant to search warrants dated January 27, 2014, and April 7, 2014. Although the subject warrant applications did not contain a traditional jurat or form notice (*see* Penal Law § 210.45; *People v Sullivan*, 56 NY2d 378, 383-384 [1982]), they were labeled as affidavits, each identified the affiant by name declaring that he was "being duly sworn deposes and says," and the magistrate's signature appeared below the affiant's signatures signifying that the magistrate witnessed the affiant's signatures. Under these circumstances, we agree with the Supreme Court that there was substantial compliance with CPL 690.35 (*see People v Sullivan*, 56 NY2d at 383; *People v Zimmer*, 112 AD2d 500, 501 [1985]).

We agree with the defendant that the Supreme Court erred in admitting into evidence an article entitled "Hypernatremia" from the website Wikipedia. The People failed to properly authenticate the document as a fair and accurate depiction of the content of that article on the date that the defendant's cell phone allegedly accessed the website (*see generally People v Barcero*, 116 AD3d 1060, 1060 [2014]; *People v Johnson*, 51 Misc 3d 450, 461 [County Ct, Sullivan County 2015]). However, the error was harmless, as there was overwhelming evidence of the defendant's guilt, and no significant probability that the defendant would have been acquitted if not for the error in admitting the article (*see People v Crimmins*, 36 NY2d 230, 241-242 [1975]; *People v Phem*, 73 AD3d 1088, 1089 [2010]; *People v Rivera*, 192 AD2d 561, 562 [1993]).

The sentence imposed was not excessive (*see* CPL 470.15; *People v Delgado*, 80 NY2d 780, 783 [1992]; *People v Kordish*, 140 AD3d 981 [2016]).

The defendant's remaining contentions are without merit. Leventhal, J.P., Sgroi, LaSalle and Barros, JJ., concur.