[973 NE2d 152, 950 NYS2d 57]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ZAHIRA MATOS, Appellant.

Argued April 24, 2012; decided May 31, 2012

## POINTS OF COUNSEL

*Office of the Appellate Defender*, New York City (*Margaret E. Knight* and *Richard M. Greenberg* of counsel), for appellant. I. As this Court recently held in *People v Lewie* (17 NY3d 348 [2011]), where Zahira Matos did not engage in any of the actions that led to her son's death, and where Ms. Matos was neither depraved nor indifferent to the results of Carmen Molina's abuse of her child, the evidence of depraved indifference was legally insufficient. (*People v Danielson*, 9 NY3d 342; *People v Flint*, 66 AD3d 1245; *People v Molina*, 50 AD3d 493; *People v Feingold*, 7 NY3d 288; *People v Heslop*, 48 AD3d 190, 10 NY3d 935; *People v Robinson*, 278 AD2d 798, 96 NY2d 762; *People v Baker*, 14 NY3d 266; *People v Glover*, 57 NY2d 61; *People v Alvarez*, 38 AD3d 930, 8 NY3d 981; *People v Green*, 56 NY2d 427.) II. Zahira Matos was denied her constitutional right to present a defense by the court's improper preclusion of expert testimony and arguments about how Ms. Matos' long history of domestic abuse impacted upon her ability to leave the relationship with Carmen Molina and protect her children, which would have undermined the prosecution's contention that Ms. Matos acted with a depraved indifference to human life. (*People v Bryant*, 278 AD2d 7; *People v Gracius*, 6 AD3d 222; *People v Concepcion*, 17 NY3d 192; *People v LaFontaine*, 92 NY2d 470; *De Long v County of Erie*, 60 NY2d 296; *People v Almonor*, 93 NY2d 571; *People v Taylor*, 75 NY2d 277; *People v Florestal*, 53 AD3d 164; *People v Cronin*, 60 NY2d 430; *People v Byrd*, 51 AD3d 267.) III. Zahira Matos' conviction must be reversed because the homicide charges, which encompassed a two-month time period, did not provide the defense with proper notice of the prosecution's theory of the case, thereby preventing the defense from effectively countering the argument that Ms. Matos' failure to leave Carmen Molina earlier evinced depraved indifference, and

creating the risk of a variance between the trial and grand jury evidence. (*People v Iannone*, 45 NY2d 589; *People v Sanchez*, 84 NY2d 440; *People v Fitzgerald*, 45 NY2d 574; *People v Lewie*, 67 AD3d 1056, 17 NY3d 348; *People v Feingold*, 7 NY3d 288.) IV. Zahira Matos was subjected to custodial interrogation without *Miranda* warnings; the subsequent questioning at the precinct, during which *Miranda* warnings were finally provided, constituted a continuous chain of events such that the taint of the initial *Miranda* violation was never dissipated. Ms. Matos' later statements to the police were also involuntary, and the physical evidence seized from the apartment was obtained through an illegal search and arrest. (*Dickerson v United States*, 530 US 428; *Miranda v Arizona*, 384 US 436; *People v Anderson*, 42 NY2d 35; *People v Harris*, 48 NY2d 208; *People v Yukl*, 25 NY2d 585; *People v Hardy*, 223 AD2d 839; *People v Bailey*, 140 AD2d 356; *People v Pabon*, 120 AD2d 685; *People v McIntyre*, 138 AD2d 634; *People v Chapple*, 38 NY2d 112.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Vincent Rivellese* and *Hilary Hassler* of counsel), for respondent. I. Defendant's motion to suppress her statements and the physical evidence seized from her apartment was properly denied. (*People v Cruz*, 90 NY2d 961; *People v Alvaranga*, 84 NY2d 985; *People v Crimmins*, 64 NY2d 1072; *Dickerson v United States*, 530 US 428; *Miranda v Arizona*, 384 US 436; *Oregon v Mathiason*, 429 US 492; *People v Berg*, 92 NY2d 701; *People v Paulman*, 5 NY3d 122; *People v Harris*, 48 NY2d 208; *People v Yukl*, 25 NY2d 585.) II. The evidence overwhelmingly proved defendant's guilt of recklessly causing Yovanny's death, while exhibiting her depraved indifference to his life, by failing to get him medical attention for hours while she knew he had life-threatening injuries. (*People v Lewie*, 17 NY3d 348; *People v Danielson*, 9 NY3d 342; *People v Bleakley*, 69 NY2d 490; *People v Romero*, 7 NY3d 633; *People v Sala*, 95 NY2d 254; *People v Dekle*, 56 NY2d 835; *People v Tejeda*, 73 NY2d 958; *People v Norman*, 85 NY2d 609; *People v Feingold*, 7 NY3d 288; *People v Cabey*, 85 NY2d 417.) III. The trial court's denial of defendant's barebones pretrial request for a ruling admitting expert testimony to explain why defendant did not leave Molina was a sound exercise of discretion; defendant's more elaborate appellate arguments are unpreserved and also lack merit. (*People v Taylor*, 75 NY2d 277; *People v Lee*, 96 NY2d 157; *People v Cronin*, 60 NY2d 430; *People v Brown*, 97 NY2d 500; *People v Fleming*, 70 NY2d 947; *People v Russell*, 71 NY2d 1016; *People v Florestal*, 53 AD3d 164; *People v Bryant*, 278 AD2d 7; *People v Crimmins*, 36 NY2d 230.) IV.

The indictment provided defendant with fair notice of the conduct for which she was ultimately convicted. (*People v Sanchez*, 84 NY2d 440; *People v Grega*, 72 NY2d 489; *People v Keindl*, 68 NY2d 410; *People v Iannone*, 45 NY2d 589; *People v D'Angelo*, 98 NY2d 733; *People v Watt*, 81 NY2d 772; *People v Fitzgerald*, 45 NY2d 574; *People v Morris*, 61 NY2d 290; *People v Ray*, 71 NY2d 849; *People v Rivera*, 84 NY2d 766.)

### OPINION OF THE COURT

CIPARICK, J.

We are asked to consider whether the evidence was sufficient to show that defendant possessed the culpable mental state of depraved indifference to human life to warrant a conviction for murder in the second degree as per Penal Law § 125.25 (4) (depraved indifference murder of a child under 11 years old). We hold that the record does not support such a finding and that the conviction for second-degree depraved indifference murder of a child must be vacated.

I

In the early evening hours of September 18, 2004, while defendant was out shopping, defendant's partner, Carmen Molina, severely beat defendant's 23-month-old son. In the course of the beating, the child's leg and several ribs were broken. Additionally, the child suffered injuries to his liver and lungs, which caused severe internal bleeding. When defendant returned home at approximately 7:00 P.M., Molina informed defendant that she would be upset and that her son was injured. Defendant knew at this time her son "was hurt bad." She claimed that her son had "a bump on his head and one on his leg." She testified that she did not, however, believe he was "seriously" injured or "that he was going to die." At Molina's urging, defendant initially elected not to call for help. Molina told defendant that if they called the police they would both get in trouble and defendant would lose her children. Instead, again at Molina's request, defendant went to a local pharmacy to purchase a splint for her son's leg. The pharmacy did not carry splints so defendant purchased ACE bandages, and Molina and defendant created a makeshift splint using the bandages and slats from a crib. After splinting the leg, defendant gave her son some children's ibuprofen and laid him down to sleep. She claimed that just prior to laying the child down, he said "night night." After placing the child in bed, defendant smoked a cigarette and

then went outside to make some phone calls from a pay phone at a local sandwich shop. Defendant called Molina's mother and her own mother. She did not mention her child's condition to either during these phone calls. She returned home and approximately seven hours after she discovered that her child had been severely injured, she claims she heard him whimpering. She picked him up and discovered blood flowing from his rectum. Molina took the child from defendant and ordered defendant to clean up the bloody clothes and sheets. Defendant disposed of them as well as the makeshift splint. Defendant then called the police from a neighbor's phone. The police and EMS arrived. According to defendant, the child became unresponsive prior to the arrival of EMS. The EMS technicians were unable to revive the child and he was rushed to the hospital. Doctors at the hospital were also unable to revive the child, and he was pronounced dead at 2:26 A.M.

During questioning by the police, defendant provided varying accounts of what had happened to her son. Initially she claimed that her son fell at approximately 9:00 P.M. while she was bathing him. Additionally, she claimed that her son would bang his head against the wall during the night. She subsequently accused the child's father, who was in Michigan, of using witchcraft and causing the bruises. When confronted by the police that her stories simply could not be true she eventually admitted that Molina had beaten the child and that she had assisted Molina in splinting the leg and attempting to dispose of the bloody clothes and bandages. After being advised of her *Miranda* rights, defendant executed a written and oral statement confirming that Molina had beaten the child and that defendant had helped to hide the evidence.

The medical evidence presented at trial showed that the child had died from "fatal child abuse syndrome" and had multiple blunt impacts to his head, torso and extremities that fractured his leg and ribs and lacerated his liver. The medical experts at the trial opined that the child would have been in severe pain for several hours before going into shock and that gradually his vital organs would have shut down. Additionally, the medical experts stated that it was unlikely that the child, after suffering these injuries, would have slept peacefully or woken up after having lost consciousness.

Defendant and Molina were arrested and a grand jury returned an indictment charging both women with two counts each of murder in the second degree (Penal Law § 125.25 [2]

[depraved indifference murder resulting from conduct creating a grave risk of death] and Penal Law § 125.25 [4] [depraved indifference murder resulting from conduct creating a grave risk of serious injury or death of a child under 11]),[1] and two counts of endangering the welfare of a child with regard to defendant's older daughter (Penal Law § 260.10 [1], [2]). Defendant and Molina each moved to suppress their statements and evidence seized from their apartment. Supreme Court denied the motions. On April 25, 2007, Molina pleaded guilty to second-degree murder and was sentenced to an indeterminate period of imprisonment of 15 years to life. On January 25, 2008, defendant proceeded to trial before a jury. On February 7, 2008, the jury acquitted defendant of depraved indifference murder, but convicted her of depraved indifference murder of a child and both counts of endangering the welfare of a child. She was sentenced to an indeterminate period of imprisonment of 20 years to life. The Appellate Division affirmed (*see People v Matos*, 83 AD3d 529 [1st Dept 2011]). A Judge of this Court granted defendant leave to appeal (17 NY3d 808 [2011]) and we now modify by vacating the murder count.

## II

We have visited the issue of depraved indifference murder on several occasions. In *People v Feingold* (7 NY3d 288 [2006]), we explained that "depraved indifference to human life is a culpable mental state" that "is best understood as an utter disregard for the value of human life—a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not" (*id.* at 296, 298 [internal quotation marks omitted], quoting *People v Suarez*, 6 NY3d 202, 214 [2005]).

The issue presented in this case is similar to the one presented in *People v Lewie* (17 NY3d 348 [2011]), where we examined the culpable mental state of a mother whose boyfriend

---

1. Penal Law § 125.25 (2) provides: "Under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which *creates a grave risk of death to another person*, and thereby causes the death of another person" (emphasis added).

Penal Law § 125.25 (4) provides: "Under circumstances evincing a depraved indifference to human life, and being eighteen years old or more the defendant recklessly engages in conduct which *creates a grave risk of serious physical injury or death to another person less than eleven years old* and thereby causes the death of that person" (emphasis added).

fatally abused her child.[2] In *Lewie* the mother of the decedent brought her child into the hospital where he expired (*see id.* at 353). At the time of the child's death he "had injuries consistent with very severe abuse" (*id.* at 354).

The mother in *Lewie* was prosecuted on two theories: first that she failed to seek medical attention in the last two or three days of her child's life, when she knew that her child had life-threatening injuries, and second that she left the child in the care of her boyfriend when she knew that to do so would place the child in danger (*see id.*).[3] In *Lewie* we focused on the mother's decision to leave the child with the boyfriend (*see id.* at 355).[4] Here, we are focused on defendant's failure to seek medical attention. While we concede that defendant's behavior fell egregiously short of what we would expect from an ordinary person, faced with a child in such distress, to say nothing of a mother of said child, it does not rise to the level of "wickedness, evil or inhumanity" so "as to render the actor as culpable as one whose conscious objective is to kill" (*Suarez*, 6 NY3d at 214). Indeed, while she did, as the Appellate Division found, "place[ ] her own interests ahead of her son's need for emergency treatment" (*Matos*, 83 AD3d at 531), the People failed to prove that she did not care whether her son lived or died. The evidence showed that she splinted her son's leg, gave him ibuprofen and exhibited other, albeit woefully inadequate, measures to comfort him. Additionally, when she found him bleeding and unresponsive, she did, in fact, call for help. It is undeniable that this behavior was a quintessential case of far too little, far too late; it does however, demonstrate that while the evidence clearly shows that defendant "cared much too little about her child's safety, it cannot support a finding that she did not care at all" (*Lewie*, 17 NY3d at 359). As for the fact that she attempted to conceal the crime, that also does not evince a mental

---

**2.** In *Lewie* the mother was charged with reckless endangerment (Penal Law § 120.25) as opposed to second-degree murder. We stated that because the only difference in the two statutes is that "the murder statute adds the words 'and thereby causes the death of another person' " (*id.* at 358), and because the child actually did die "we [could not] uphold her reckless endangerment conviction unless we would uphold a murder conviction on the same facts" (*id.*).

**3.** In the instant case, while there is evidence that defendant knew that Molina was a danger to her child, the People proceeded only on the theory that defendant failed to act during the last seven hours of the child's life.

**4.** The Appellate Division rejected the failure to seek medical attention theory and the People did not pursue that theory in their argument before us (*see id.*).

state of depraved indifference. "Trying to cover up a crime does not prove indifference to it" (*id.* at 360). Thus, the evidence of depraved indifference was legally insufficient, and the conviction for second-degree murder cannot be sustained.

We acknowledge that defendant's actions here may have come within Penal Law § 125.25 (4) when it was first enacted in 1990. It must be noted, however, that when the Legislature enacted Penal Law § 125.25 (4) "depraved indifference" was not considered to be a mens rea but simply a "definition of the factual setting in which the risk creating conduct must occur" (*People v Register*, 60 NY2d 270, 276 [1983]). However, in the wake of *Feingold* and its progeny we are constrained to interpret "depraved indifference" to human life as a culpable mental state which must be proven by the People (*see* 7 NY3d at 296). That element was not proven in this case. The Legislature may want to consider amending section 125.25 (4) in light of the *Feingold* decision.

As for defendant's remaining arguments, we find them to be without merit. We will not speculate, had the evidence been sufficient to sustain a depraved indifference murder of a child conviction, as to whether the preclusion of defense expert witness testimony on the issue of abusive relationships was error, warranting reversal, since the testimony would not have been relevant to the remaining counts. Neither will we opine on whether a proper remedy would be a reduction of the murder count to manslaughter in the second degree or criminally negligent homicide, which were submitted as lesser included counts, but not reached by the jury. We have not yet decided the issue as to whether either crime is a proper lesser included offense of depraved indifference murder of a child (*see People v Baker*, 14 NY3d 266, 272 [2010]). We therefore dismiss the count of the indictment charging depraved indifference murder of a child, without prejudice to re-presentation of appropriate charges to a new grand jury.

Accordingly, the order of the Appellate Division should be modified by dismissing the count of the indictment charging depraved indifference murder of a child and remitting to Supreme Court for resentencing and, as so modified, affirmed, without prejudice to an application by the People to re-present any appropriate charges to another grand jury.

PIGOTT, J. (dissenting). Viewing the evidence in the light most favorable to the People, as we must when reviewing the sufficiency

of the evidence when there is a jury verdict in their favor, the facts are these:

At approximately 7:00 P.M. on September 18, 2004, while defendant was out buying beer, defendant's partner, Carmen Molina, inflicted multiple blows to the tiny frame of defendant's 23-month-old son, resulting in a broken leg, a "crushing [and extensive] injury" to the left side of his liver (to the point where it was nearly torn from the right side), three broken ribs and bruising to the lungs and diaphragm muscle. When defendant returned and found her child in that condition, heard the accompanying cries and whimpers of pain, did defendant—who was no stranger to the emergency room for herself and her children—call an ambulance? No.

At Molina's direction, defendant went to a nearby pharmacy and purchased a bandage. Finding this unsatisfactory, Molina broke pieces of wood from a crib and attempted to fashion a splint. According to defendant herself, Molina wrapped the tape so hard that it hurt defendant to hold the wood while it was being taped. With the "splint" now secure, defendant gave her child baby ibuprofen and put him to sleep.

But, according to the medical testimony, defendant's child was not sleeping. For the next several hours, he lay in agony with "painful injuries," dying over a "period of . . . hours," first exhibiting pain through uncontrollable crying, whimpering or moaning. As he gradually went into shock due to the pain and internal bleeding, he would have started panting before losing consciousness. If defendant had lifted her finger to dial three digits, her child could have been saved. According to the People's medical expert:

> "There was a lot that could have been done for this child. First of all, he was in pain. His leg, every time his leg was moved, he felt pain. Every time he tried to breathe, he felt pain. So he could have been treated for the pain . . . They would have opened up his abdomen. They would have stopped the bleeding from the liver, and they would have removed the damaged portion of the liver, and taken out the blood from his abdomen. All of those things would have increased his chances of surviving."

While her child suffered, defendant smoked and watched television. She went outside and made two phone calls, one to Molina's mother concerning a birthday present for Molina's brother,

and another to her own mother—never mentioning her child's condition to either of them. Did she call an ambulance at this point? No. She returned to the apartment and did nothing. In fact, she took no action until 2:00 A.M. when, according to her own testimony, she heard her child "whining" and noticed that he was bleeding from his rectum and sullying the sheets. Did she call the ambulance then? No. Instead, approximately seven hours after the assault, when her son stopped breathing, defendant called 911; but not before she and Molina cleaned the blood from the bathroom floor, removed the splint and disposed of it along with the blood-soaked wipes and some of her child's blood-stained clothing. When help arrived, they found the child naked, battered and bloodied on a hallway floor—dead. When asked, defendant claimed her son had fallen in the bathtub and that he had a habit of banging his head against the wall when he slept.

In my view, based on the foregoing facts, there was "a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (*People v Acosta*, 80 NY2d 665, 672 [1993]). And, given this evidence, the jury could have rationally concluded that defendant's unwillingness to act did not demonstrate that she "cared much too little about her child's safety" but, rather, that "she did not care at all" (*People v Lewie*, 17 NY3d 348, 359 [2011]).

The majority reaches a contrary conclusion, stating that defendant "splinted her son's leg, gave him ibuprofen and exhibited other, albeit woefully inadequate, measures to comfort him," such that although her attempts to help her child were "far too little, far too late," that didn't mean that she was indifferent to his plight (majority op at 476). This, to me, is not construing the evidence in a light most favorable to the People, but, instead, substituting a different set of facts and conclusions for those reached by the jury. The jury could have reached a contrary conclusion but it didn't. Rather, under these facts, the jury easily concluded that defendant's "efforts" were part of her attempt to avoid having to take her child to the hospital (thereby potentially implicating herself in her child's abuse) and not the equivalent of caring "much too little." Given the medical testimony and defendant's omissions, there is sufficient evidence here for the jury to have concluded that defendant "did not care at all."

This case is plainly distinguishable from *Lewie*. First, the People's theory in *Lewie* was that the mother was guilty of reckless

endangerment in the first degree for leaving her eight-month-old son with a known abuser during the day over a six-week period. The People's theory in this case was that defendant was guilty of depraved indifference murder pursuant to Penal Law § 125.25 (4) because she sat idly by while her nearly two-year-old son was dying over a seven-hour period as a result of significant injuries. Second, in *Lewie*, the baby's cause of death was a brain injury that was less than four days old, an injury not noticeable to a layperson, and the mother's conviction for manslaughter in the second degree for failing to seek medical attention was dismissed by the Appellate Division on sufficiency grounds. Here, the evidence showed that the child had significant injuries, showed clear signs of pain and inability to breathe while defendant all but ignored her son, offering no protection whatsoever. Thus, while the mother in *Lewie* was hardly a sympathetic character, the People in that case failed to prove the critical element of whether she was indifferent to her baby's plight, whereas in this case, given the extent of the child's injuries and the insufferable amount of pain he was subjected to over seven hours, the jury could have rationally concluded that defendant did not care at all about his plight, the splint and ibuprofen notwithstanding.

In my view, this is a textbook case of a defendant whose failure to act demonstrated a "wanton cruelty, brutality or callousness directed [at] a particularly vulnerable victim [i.e., her own son], combined with utter indifference to the life or safety of the helpless target" as the result of her omissions (*People v Suarez*, 6 NY3d 202, 213 [2005]). Because on this evidence the jury could and did rationally conclude that defendant did not care at all about her own child's plight, I would affirm the order of the Appellate Division.

Chief Judge Lippman and Judges Graffeo, Smith and Jones concur with Judge Ciparick; Judge Pigott dissents and votes to affirm in a separate opinion in which Judge Read concurs.

Order modified, etc.