People v Verneus (2020 NY Slip Op 03256)





People v Verneus


2020 NY Slip Op 03256


Decided on June 10, 2020


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on June 10, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

RUTH C. BALKIN, J.P.
JOHN M. LEVENTHAL
SHERI S. ROMAN
FRANCESCA E. CONNOLLY, JJ.


2016-07028
 (Ind. No. 1998/14)

[*1]The People of the State of New York, respondent,
v
Shirley Verneus, appellant.


Paul Skip Laisure, New York, NY (David L. Goodwin of counsel), for appellant.
Melinda Katz, District Attorney, Kew Gardens, NY (John M. Castellano, Johnnette Traill, Merri Turk Lasky, and Shann Y. Brodt of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Queens County (Richard Buchter, J.), rendered April 27, 2016, convicting her of assault in the first degree, reckless endangerment in the first degree, and endangering the welfare of a child, upon a jury verdict, and imposing sentence.
ORDERED that the judgment is modified, on the facts, by reducing the conviction of assault in the first degree to assault in the third degree, reducing the conviction of reckless endangerment in the first degree to reckless endangerment in the second degree, and vacating the sentences imposed upon those convictions; as so modified, the judgment is affirmed, and the matter is remitted to the Supreme Court, Queens County, for sentencing on the convictions of assault in the third degree and reckless endangerment in the second degree.
The defendant was charged, inter alia, with assault in the first degree and reckless endangerment in the first degree, in connection with injuries sustained by her then 20-month-old foster child (hereinafter the child). On January 17, 2014, the defendant brought the child to the foster care agency for a visit with his father. The father observed that the child appeared to be in pain and that there was an odor coming from him. The father then discovered extensive burns on the child's legs and feet. Both lower legs had been bandaged in a self-adhesive bandage with "a little bit" of gauze. The child was taken to the hospital. It was determined that the child had second- and third-degree burns on 12% of his body surface, which would require excision and skin grafts.
When questioned about the subject incident on multiple occasions by the foster care agency, the police, and the Administration for Children's Services (hereinafter ACS), the defendant stated that on January 15, 2014, she had heard the child screaming from the bathroom, and went in to discover the child in the bathtub, which was filling up with hot water. The defendant reported that the child's three-year-old sister was standing outside the tub looking frightened. The defendant reported to ACS that the child was hanging over the side of the tub trying to get out. When the defendant took the child out of the tub his skin started coming off of his legs.
While the defendant's account of the manner in which the child was burned never changed, the defendant gave conflicting accounts to ACS, the foster care agency, and the police as to the care she rendered afterward. She first reported that she had taken the child to the hospital [*2]where he had been treated and released. She later admitted, however, that while she had a friend drive her to the hospital, once they arrived, she panicked and went instead to a local pharmacy for advice on how to treat a burn. The defendant purchased antibacterial ointment, aloe vera gel, and bandages. After doing some research on the internet, the defendant used these items to treat the child's burns.
Following a jury trial, the defendant was convicted of assault in the first degree, reckless endangerment in the first degree, and endangering the welfare of a child, and sentence was imposed. She now appeals, arguing, among other things, that the convictions of assault in the first degree and reckless endangerment in the first degree were against the weight of the evidence because the People failed to prove beyond a reasonable doubt the requisite "depraved indifference" elements of those offenses.
We agree with our dissenting colleague that the defendant's treatment of the child was abhorrent and unacceptable. However, in determining this appeal, we are not called upon to decide whether the defendant engaged in blameworthy conduct generally. Instead, we are required to determine whether the People proved that the defendant was guilty of the particular offenses of which she was convicted. Upon weighing conflicting testimony and determining which facts were proven at trial, as we must when called upon to conduct weight of the evidence review (see People v Danielson, 9 NY3d 342, 348), we must conclude that the People failed to prove the defendant's guilt of assault in the first degree and reckless endangerment in the first degree beyond a reasonable doubt.
To convict the defendant of those charged offenses, the People were required to prove that the defendant acted under circumstances evincing a depraved indifference to human life (see Penal Law §§ 120.10[3]; 120.25). Depraved indifference to human life is a culpable mental state that is "best understood as an utter disregard for the value of human life" (People v Feingold, 7 NY3d 288, 296 [internal quotation marks omitted]; see People v Wilson, 32 NY3d 1, 6-7; People v Barboni, 21 NY3d 393, 400). The Court of Appeals has observed that while consciously disregarding a substantial risk to the life of a child is "shocking behavior, and in ordinary speech people might call it depraved,'" depraved indifference to human life, as defined by law, "is something even worse" (People v Lewie, 17 NY3d 348, 359). As the Court of Appeals has made clear, "the word indifference' is to be taken literally," such that "a person who is depravedly indifferent is not just willing to take a grossly unreasonable risk to human life—that person does not care how the risk turns out" (id. at 359).
Thus, the Court of Appeals concluded in People v Lewie (17 NY3d 348) and People v Matos (19 NY3d 470) that the mothers of children grievously injured by the mothers' boyfriends did not evince a depraved indifference to human life based on, inter alia, their failures to obtain proper medical care for their children. In both cases, the Court emphasized that the defendants had taken some, "albeit woefully inadequate," measures to protect their children (People v Matos, 19 NY3d at 476). In Matos, the case most on point, the Court reasoned that the defendant, whose child was severely beaten and suffered a broken leg, broken ribs, and injuries to his liver and lungs which caused severe internal bleeding, had shown her lack of indifference by making a homemade splint for her son's leg, giving him ibuprofen, and trying to comfort him (see id.).
In contrast to Matos and Lewie, the Court of Appeals concluded in People v Barboni (21 NY3d 393) that the defendant, who beat a 15-month-old child, causing four distinct skull fractures, and then failed to obtain medical care for him, evinced a depraved indifference to human life. The Court reasoned, in Barboni, that it was "significant that [the] defendant was the actor who had inflicted the injuries in the first place" (id. at 402).
The People's theory in the present case was that the defendant not only failed to obtain proper medical care for the child after he was burned, but also affirmatively caused the burns by holding the child down under scalding hot water. Thus, the People contend that this case is comparable to Barboni. However, the People's evidence failed to prove, beyond a reasonable doubt, that the defendant held the child under scalding hot water so as to cause the burns.
In support of this theory, the People offered the testimony of Roger Yurt, a physician specializing in burn care, regarding the burn pattern he observed on the child. In particular, Yurt testified that the burn pattern showed that the child was lying on his side in the tub and that he was not "splashing or thrashing about." This is the only evidence the People offered to prove that the defendant held the child down under scalding water. Significantly, Yurt admitted that "in order to say exactly what occurred," he would have to know the water level, size, and shape of the tub and the approximate temperature of the water, but that he did not know any of those things.
Further, there were inconsistencies between Yurt's trial testimony and his grand jury testimony which, contrary to the People's contention, were not "minor," but went to the key premises on which the People based their theory that the defendant caused the burns. Specifically, while Yurt testified at trial that the burn pattern demonstrated that the child was lying on his side in the tub, a fact he deemed to evince that the defendant had caused the burn, when asked in the grand jury proceeding what position the child's body would have been in to account for the burns, Yurt testified that he would have been lying on his stomach. Additionally, before the grand jury, Yurt acknowledged that the history he was given as to the subject incident was consistent with "the nature and extent of the burns." That history, as Yurt testified on direct examination, was as follows: "the patient was burned three days ago when [his] sister turned on hot water on him while in the tub." This obfuscates Yurt's trial testimony that the "nature and extent of the burns" showed that an adult held the child down in the water.
The inconsistencies in Yurt's testimony undermined the People's already tenuous theory that the defendant affirmatively caused the burns. In sum, contrary to the conclusion of our dissenting colleague, when giving the evidence its proper weight, it did not prove beyond a reasonable doubt that the defendant held the child down under scalding water.
Accordingly, to establish the "depraved indifference" element of the subject offenses, we are left with the defendant's failure to obtain proper medical care for the child. This case is thus squarely controlled by Lewie and Matos. As in those cases, while the evidence in this case shows that the defendant "cared much too little about [the] child's safety, it cannot support a finding that she did not care at all" (People v Lewie, 17 NY3d at 359; see People v Matos, 19 NY3d at 476). Like the defendant in Matos, the defendant in the present case took measures, "albeit woefully inadequate" ones, to care for the child, by inquiring about proper burn care at a pharmacy, purchasing ointments and bandages, and keeping the burns covered. Those measures are commensurate with the measures taken by the defendant in Matos who reacted to a beating that caused her child severe internal bleeding and multiple broken bones by making a homemade splint for her son's leg and giving him ibuprofen (see id. at 476).
Our dissenting colleague posits that the defendant took these measures to conceal the crime. However, the evidence does not demonstrate that the measures the defendant took to assist the child were solely taken to conceal the crime, and did not display caring. As the Court of Appeals has concluded, where a defendant displays caring and also attempts to conceal the crime, including, in Lewie, by dressing her infant son in a snowsuit with a hood covering his head to hide his fatal injuries from witnesses (see id. at 356), such attempts at concealment did not prove indifference (see People v Matos, 19 NY3d at 476-477; People v Lewie, 17 NY3d at 360).
Our dissenting colleague also focuses on the amount of time during which the defendant did not act to obtain medical care for the child. As an initial matter, the record is not clear as to when the child suffered the burn. Yurt testified at trial that the injury would have occurred 10 to14 days before the child was seen at the hospital, or between January 4 and 8. However, the foster care agency performed a home visit on January 7, at which the child was present and not in distress. Yurt admitted that this would not have been possible had the child been burned before the home visit. Before the grand jury, Yurt testified, different from his trial testimony, that the injury would have occurred 10 to14 days before he, Yurt, saw the child on January 23. That would make the date of injury somewhere between January 9 and January 13, or 4 to 8 days before the burns were discovered by the father.
In any event, while the time period here is certainly longer than the seven-hour delay [*3]in obtaining medical care in Matos, any comparison of the delays must take into account the relative urgency presented by the injuries sustained. At the time the defendant in Matos called 911, there was blood "flowing" from the child's rectum and he was unresponsive prior to the arrival of Emergency Medical Services (People v Matos, 19 NY3d at 474). Without minimizing the extent of the suffering experienced by the child in this case, the urgency of his medical condition was not equivalent to that of the child in Matos.
In sum, while the defendant's treatment of this child after he sustained the burns was "reckless, selfish and reprehensible," and undoubtedly caused the child great suffering, under the case law, her conduct simply did not evince depraved indifference to human life (People v Williams, 24 NY3d 1129, 1132; see People v Matos, 19 NY3d 470; People v Lewie, 17 NY3d 348). Thus, the convictions of assault in the first degree and reckless endangerment in the first degree were against the weight of the evidence. The evidence did, however, support convictions on lesser included offenses of assault in the third degree and reckless endangerment in the second degree (Penal Law §§ 120.00, 120.20), and we therefore respectively reduce the convictions of assault in the first degree and reckless endangerment in the first degree accordingly.
The defendant's remaining contentions either are without merit or need not be reached in light of our determination.
Accordingly, we modify the judgment and remit the matter to the Supreme Court, Queens County, for sentencing on the convictions of assault in the third degree and reckless endangerment in the second degree.
BALKIN, J.P., LEVENTHAL, and CONNOLLY, JJ., concur.
ROMAN, J.,concurs in part and dissents in part, and votes to modify the judgment, on the law, by vacating the conviction of reckless endangerment in the first degree, vacating the sentence imposed thereon, and dismissing that count of the indictment, and to affirm the judgment as so modified, with the following memorandum:
Although the conviction of reckless endangerment in the first degree must be vacated as an inclusory concurrent count of assault in the first degree, I disagree with the majority's determination that the evidence was insufficient to support the defendant's convictions of assault in the first degree and reckless endangerment in the first degree. Accordingly, I respectfully dissent.
The defendant was accused of holding her approximately 20-month-old foster child in a bathtub of scalding hot water, resulting in the child suffering second- and third-degree burns to his legs, and thereafter failing to seek medical assistance for the child. At the defendant's jury trial, the People's evidence established that on January 17, 2014, the defendant brought the child to SCO Family of Services (hereinafter SCO) for a scheduled visitation session with the child's biological father, after having missed two previously scheduled visitation sessions on January 9 and January 10, 2014. Although the defendant had missed visits in the past, she had never missed two consecutive visits. While the child would usually walk into the room, on this date the defendant carried him in and handed him to the child's father. The child's father smelled an odor coming from the child, and the child was "bracing" when the father touched him. The child's father undressed the child and saw that the child was "burned all over his legs." The police and paramedics were summoned.
Upon arrival, Police Officer Scott Munro observed that the child was crying and very uncomfortable, and that he had a blue wrap around his legs. Munro observed burns on the child's legs, as well as "oozing" that did not smell like ointment. Sergeant William DiThomaso, who had also responded to SCO, similarly observed burns "all over the top of [the child's] legs," and "pusy wounds" with dirty bandages. A responding paramedic noticed that each of the child's legs had been bandaged in an adhesive bandage from the mid-calf to the foot. She observed "green pus which was an indication of infection," and there was a "mild, rotten meat smell." The child was transported to the hospital.
Munro spoke with the defendant at SCO, and the defendant told Munro that "a few days prior she was at home in the kitchen" when she heard screams upstairs. She went upstairs and found the child in the tub filling up with hot water, and the child's sister was outside of the tub. She told Munro that she later brought the child to a hospital. She stated that she saw a doctor and that the child was admitted to the hospital. The doctor advised her to use Neosporin and bandages, and the child was released the next day.
The defendant also spoke with Sergeant DiThomaso. The defendant told DiThomaso that "two days" earlier, she had been at home when she heard a scream. She found the child in the bathtub with the water running. She told DiThomaso that she brought the child to North Shore Hospital, but her friend was driving and she could not recall which location. DiThomaso asked the defendant if she could contact her friend, but she stated that her phone was not working. DiThomaso observed that the defendant had her phone in her hand and was text messaging with someone.
The child was examined by an attending physician in the emergency department at New York Presbyterian Weill Cornell Medical Center (hereinafter the hospital). The attending physician assessed the child as suffering from "full thickness burns of both feet and legs and right knee and thigh." He estimated that the burns were "a good two weeks" old. The child was admitted to the burn unit.
Malvina Sher, a clinical specialist in physical therapy in the burn unit, assessed the child on January 21, 2014. The child was not able to sit or stand, or perform any activities that would require him to place his feet on the ground, including soft surfaces.
On January 23, 2014, the child was examined by Roger Yurt, a physician who was the director of the burn center at the hospital. Yurt, who testified as expert in the field of burn surgery, explained that the child had suffered a mixture of second- and third-degree burns, which were caused by scalding hot water. He testified that it would take one second to get a third-degree burn in 155-degree water, and approximately three to five minutes in 120-degree water. The child had "12 percent total body surface area burn." Yurt testified that Neosporin and an adhesive bandage would not be appropriate medical treatment for the child's burns. He noted that every time an adhesive dressing was changed it would pull off any new healing skin and make the wound worse. Yurt recommended skin graft surgery for the child, which he performed on January 24.
Yurt testified that the child's injuries were not consistent with either being seated in a tub with the water running, or in a standing position trying to climb out over the tub. Based on the distribution of the burns, Yurt concluded that the child would have been lying on his side. He further testified that the well-defined burn line indicated that the child was in that position for a "period of time" and was not able to move. Had the child been able to move, he would have splashed around causing burns to other areas of his body, particularly his arms and hands. However, there were no burns anywhere else on the child's body. Yurt testified that a three year old would not have been able to hold the child in a position where he could not flail his arms because the three year old would not have the strength to do so, and because the three year old would have suffered burns if that had occurred.
Yurt testified that the burns did not occur within just a few days prior to the child's admission to the hospital, but more likely occurred in the range of at least 10 to 14 days prior to his admission on January 17, i.e., between January 4 and January 8. He testified that the child would have been in "very severe and excruciating pain" from the time he was burned until the date he was admitted to the hospital. In addition, Yurt testified that the delay in seeking medical treatment contributed to the risk of the wounds getting deeper and the risk of infection. He concluded that the child was in a life-threatening situation as a result of the burns and the failure to properly treat them. He explained that a burn covering 12% of the body surface in a young child could lead to shock, and that an infection could spread throughout the body. Both of these conditions could cause death.
On January 24, 2014, Danielle Bembury, a child protective specialist with the Administration for Children's Services, interviewed the defendant. The defendant told her that on January 15, at about 5:45 p.m., she was in her room with one of her younger foster children, and the [*4]child and his sister were in their room watching television. She heard the child cry out, and she yelled to his sister to leave him alone because his sister would always "pick with or play around with" him. About a minute or two later, the defendant heard the child cry out again, and when she went to see what was happening she found both children in the bathroom. There was steam coming from the bathroom. The defendant stated that the child was in the tub with the water running, and he was "hanging over the side of the tub trying to get out." The child's sister was standing outside of the tub. The defendant picked the child up out of the tub and observed that the skin on his legs was beginning to peel.
The defendant indicated that she called her mother, who told her to call the 911 emergency number. The defendant reported that she had a friend coming over, and when the friend arrived she asked him to take her to the hospital to have the child treated. However, the defendant told Bembury that when they reached the hospital, the defendant panicked. The defendant did not want to take the child to the hospital because she was afraid that she would be accused of child abuse, so she returned home. The defendant indicated that she went to the local pharmacy, and was advised to use Neosporin, which she purchased along with aloe vera gel. The defendant later purchased blue bandages.
Bembury spoke with the child's three-year-old sister, but she was not able to provide any information as to how the child received the burns. The child's sister was about three feet tall, approximately 30 pounds, and very petite. There were no visible marks or injuries on the child's hand or arms.
At the conclusion of the trial, the jury found the defendant guilty of assault in the first degree (depraved indifference), reckless endangerment in the first degree (depraved indifference), and endangering the welfare of a child.
On appeal, my colleagues in the majority agree with the defendant that the evidence adduced at trial was insufficient to prove that she acted under circumstances evincing a depraved indifference to human life, as required to sustain her convictions of assault in the first degree and reckless endangerment in the first degree (Penal Law §§ 120.10[3]; 120.25).
At the outset, contrary to the defendant's contention, the evidence was legally sufficient to establish that she affirmatively caused the burns by putting the child under scalding hot water. The medical testimony presented by the People reflected that the approximately 20-month-old child was restrained in the water for a period of time in a manner that prevented him from moving or flailing his arms, as evidenced by the well-defined burn line and the lack of burns anywhere else on his body, and that the child's three-year-old sister was not capable of restraining the child in that manner. In addition, the People's evidence established that the defendant was the only adult in the house at the time that the child was burned, and that, following the incident, she never reported that the child was injured or sought medical treatment for the child's severe injuries. Viewing this evidence in the light most favorable to the People (see People v Contes, 60 NY2d 620, 621), the jury could have reasonably concluded that the defendant was responsible for causing the burns. Moreover, contrary to the defendant's further contention and the majority's determination, such a finding was not against the weight of the evidence (see People v Romero, 7 NY3d 633).
Any discrepancies between Yurt's testimony before the grand jury and his trial testimony were not so significant as to render his testimony incredible or unreliable as a matter of law (see People v Anderson, 130 AD3d 1055, 1056, affd 29 NY3d 69; People v Almonte, 23 AD3d 392, 393). Rather, these discrepancies were fully explored at trial and were matters to be considered by the jury in assessing Yurt's credibility (see People v McNeil, 181 AD3d 716, 717; People v Almonte, 23 AD3d at 393; People v Lambert, 272 AD2d 413, 414).
Furthermore, with respect to the defendant's conduct following the incident, I disagree with the majority's conclusion that the evidence cannot support a finding that the defendant "did not care at all" (People v Lewie, 17 NY3d 348, 359) about the child's safety because the defendant allegedly inquired about burn treatment at a pharmacy and purchased bandages for the wounds. The evidence showed that the defendant allowed the 20-month-old child to suffer with [*5]second- and third-degree burns over the course of approximately 10 to 14 days. The medical evidence demonstrated that, over that time, the child would have been in "very severe and excruciating pain." In fact, the second- and third-degree burns developed into what were described as "oozing" and "pusy" wounds that smelled like "mild, rotten meat." The record reflects that the child required surgery for his condition, which involved taking skin grafts from the back of the child's legs and from his buttocks. Thus, the extent of the child's injuries clearly would have been apparent to the defendant during that period. Nevertheless, the defendant never reported the child's injuries to the foster care agency or took the child to a hospital or medical clinic.
Furthermore, Yurt's testimony reflected that the burns were inflicted sometime between January 4 and January 8. Thereafter, the defendant did not take the child to the hospital, and she missed two previously scheduled visitation sessions with the biological father on January 9 and January 10. The burns were only discovered because, on January 17, the biological father undressed the child after smelling an odor and noticing that the child appeared to be in discomfort when touched. The defendant thereafter gave false and misleading statements to the police and the caseworker concerning the timing of the injuries, and the treatment she allegedly sought for the child. Notably, while the defendant claimed that she applied the bandages shortly after the child was burned, she also falsely told the police that the injury occurred on January 15. Based on the foregoing, the jury was entitled to infer that the defendant placed bandages over the child's legs solely to conceal the wounds from discovery, rather than in any attempt to treat the wounds.
The instant case is distinguishable from People v Matos (19 NY3d 470). In Matos, the Court of Appeals vacated the defendant's conviction of depraved indifference murder in connection with the death of her 23-month-old son where the defendant's intimate partner severely beat the child, causing his death. The Court held that the People failed to prove that the defendant did not care whether her son lived or died, as "[t]he evidence showed that she splinted her son's leg, gave him ibuprofen and exhibited other, albeit woefully inadequate, measures to comfort him" (id. at 476). Additionally, the Court noted that when the defendant found the child bleeding and unresponsive, she did, in fact, call for help (see id.).
In the present case, unlike Matos, the evidence was sufficient to establish that the defendant caused the injuries to the 20-month-old child. Furthermore, in Matos, the defendant called the police within 7 hours of discovering the injuries, whereas in the present case, the defendant never reported the child's injuries. Instead, as discussed, the injuries were discovered 10 to 14 days later by the child's father. The majority posits that the urgency of the child's medical condition was not equivalent to that of the child's in Matos. However, in my view, this statement understates the severity of the child's injuries in this case, in which the child suffered a mixture of second- and third-degree burns over 12% of his body surface and required significant surgical intervention.
The majority's reliance on People v Lewie (17 NY3d at 348) is likewise misplaced. In Lewie, the defendant was charged with, inter alia, reckless endangerment in the first degree for repeatedly leaving her baby, over a six-week period, with the man with whom she lived who abused and eventually killed the child (see id. at 355). The Court of Appeals vacated that conviction, finding that the evidence showed that the defendant was fearful of harm to her baby and had tried to protect the child, albeit "weakly and ineffectively" (id. at 359). No such evidence was presented in this case.
The instant case is more similar to People v Barboni (21 NY3d 393), in which the Court of Appeals upheld the defendant's conviction of depraved indifference murder and first-degree manslaughter where the evidence showed that he repeatedly struck and/or shook his girlfriend's 15-month-old son and failed to summon medical assistance. There, the Court distinguished Matos, noting that "[t]he nature of defendant's assault on the child rendered his course of conduct more clearly depraved than had he only suspected that a third party had injured the child" (id. at 401-402) and that it was "significant that defendant was the actor who had inflicted the injuries in the first place" (id. at 402). Additionally, the Court pointed out that the charge of depraved indifference murder was "comprised of more than the physical assault on the child; it also encompasses defendant's inaction for the two hours that elapsed between the injuries and death" (id.). The Court held that "[i]n light of the child's vulnerability and utter dependence on a caregiver, defendant's post-assault failure to treat the child or report his obvious injuries must be considered in assessing [*6]whether depraved indifference was shown" (id.). The Court determined that "[g]iven defendant's knowledge of how the injuries were inflicted and his failure to seek immediate medical attention, either directly or via consultation with his girlfriend, until it was too late, there was sufficient evidence for a jury to conclude that defendant evinced a wanton and uncaring state of mind" (id.). Further, the Court, in the context of this depraved indifference murder case, held that, by the defendant's "later inaction—his failure, over some two hours, to seek medical attention for the child—defendant turned a brutal assault into a brutal and prolonged course of conduct against a vulnerable victim" (id. at 403-404).
In the present case, the charges against the defendant encompassed not only causing the burns, but also her inaction over a far greater period of time than that in Barboni, i.e., 10 to 14 days between the injuries and the discovery of those injuries by the biological father. Moreover, the 20-month-old child was utterly dependent on the defendant, who isolated the child and prevented any intervention by either the foster care agency or the biological father. In my view, the defendant's conduct in causing the burns, coupled with her prolonged failure over the days that followed to seek any intervention or appropriate medical treatment for the vulnerable victim, established that the defendant acted with depraved indifference (see People v Wilson, 32 NY3d 1, 7).
Furthermore, contrary to the defendant's contention, the evidence proved beyond a reasonable doubt that the injuries presented a grave risk of death to the child. Yurt testified that the delay in seeking medical treatment contributed to the risk of the wounds getting deeper and the risk of infection. He explained that a burn covering 12% of the body surface in a young child could lead to shock, and that an infection could spread throughout the body. He further testified that both of these conditions could cause death.
In sum, I find that the evidence was legally sufficient to support the defendant's convictions of assault in the first degree and reckless endangerment in the first degree (see People v Keegan, 133 AD3d 1313, 1316; People v McKenzie, 183 AD2d 631). Moreover, according due deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (see People v Romero, 7 NY3d at 633), I am satisfied that the verdict of guilt on those counts was not against the weight of the evidence.
However, as the People correctly concede, the defendant's conviction of reckless endangerment in the first degree under Penal Law § 120.25 must be vacated, and that count of the indictment dismissed, as it is an inclusory concurrent count of assault in the first degree under Penal Law § 120.10(3) (see CPL 300.30[4]; 300.40[3][b]; People v Smith, 145 AD3d 1628; People v Swinton, 21 AD3d 1039, 1040, mod 7 NY3d 776).
I find the defendant's remaining contentions to be without merit.
Accordingly, I would modify the judgment by vacating the conviction of reckless endangerment in the first degree and otherwise affirm.
ENTER:
Aprilanne Agostino
Clerk of the Court